1   Jack Russo (Cal. Bar No. 96068)
    Christopher Sargent (Cal. Bar No. 246285)
2   COMPUTERLAW GROUP LLP
    401 Florence Street
3   Palo Alto, CA 94301
    (650) 327-9800 office
4   (650) 618-1863 fax
    jrusso@computerlaw.com
5   csargent@computerlaw.com

6   Attorneys for Defendants
    ADRIAN KAEHLER, GARY BRADSKI, and Robotics Actual, Inc.

7

8                  IN THE UNITED STATES DISTRICT COURT

9               FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  MAGIC LEAP, INC., a Delaware Corporation,        Case No. 5:16-cv-02852-NC

12                      Plaintiff;                   DECLARATION OF DR. GARY BRADSKI IN
                                                     SUPPORT OF DEFENDANTS' MOTION TO
13          v.                                       DISMISS FOR FAILURE TO STATE A CLAIM
                                                     (RULE 12(B)(6)); ALTERNATIVELY, MOTION
14  GARY BRADSKI, an individual, ADRIAN              FOR A MORE DEFINITE STATEMENT (RULE
    KAEHLER, an individual; ROBOTICS ACTUAL,         12(E)); AND/OR MOTION FOR SUMMARY
15  INC., a Delaware corporation, and                JUDGMENT (RULE 56) AS TO CLAIMS 1–4;
    OPENCV.AI, a Delaware corporation.               MOTION FOR SUMMARY JUDGMENT AS TO
16                                                   CLAIMS 5–10

17                      Defendants.

18

19

20

21

22          REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

23

24

25

26

27

28

_Computerlaw Group LLP_
_www.computerlaw.com℠_

1    I declare, under penalty of perjury, as follows:

2    1.    My name is Gary Bradski but I am sometimes addressed as Dr. Gary Bradski (I

3    have a Ph.D.). I am over the age of 18. I make the statements here of my own personal

4    knowledge and I believe them to be true. I could and would testify competently if called as a

5    witness. I am a Defendant in this action and Plaintiff in the first-filed California Superior Court

6    declaratory relief lawsuit, *Bradski et al. v. Magic Leap, Inc.*, No. 16-cv-295461 (Santa Clara

7    Super. Ct. May 23, 2016), now removed to federal court, where I sought to obtain answers to

8    questions regarding the rights to do consulting under the express "right to consult" terms of my

9    Magic Leap employment agreement. A true and correct copy of my agreement is attached as

10   **Exhibit A.**

11   ### SUMMARY OF EDUCATION

12   2.    I earned my Bachelors in Electrical Engineering and Computer Science from

13   University of California, at Berkeley in 1981. (I matriculated to University of Oregon in 1976

14   and transferred to UC Berkeley). After graduation from UC Berkeley, from 1981–1984, I lived

15   and traveled abroad.

16   3.    I later received my Ph.D. in Cognitive and Neural Systems from Boston

17   University, in 1993, where I also studied neural networks as models of brain functions and as

18   classifiers. My graduate work in the Cognitive and Neural Systems department was in the field

19   of perception systems, meant to understand and approximate brain functions, that is, computer

20   models implementing mathematical equations we thought were underlying brain function. My

21   thesis had two parts: the first part was an approximation or model of human memory. The second

22   part made use of that model for a computer to recognize jets in flight from a military database of

23   images of jets in flight.

24   ### SUMMARY OF EXPERIENCE POST COLLEGE

25   4.    I was an engineer at Schlage Electronics from September 1984–August 1985,

26   where I designed hardware and coded for proximity security systems. This was circuit design and

27   programming of electronic keys, an early version of RFID ("Radio-frequency identification").

28

Computerlaw Group LLP
www.computerlaw.com℠

5.      I was an engineer at Neuroscience from September 1985–September 1987. I worked on an early digital EEG System and debugged the hardware. I also worked on writing and debugging the software.

6.      I founded Adept Computer Consulting (1987–1989), where I consulted for the medical electronics manufacturer, Neurosoft, to produce computerized EEG. I also subcontracted on automatic visual inspection of hard disk heads for IBM.

### SUMMARY OF EXPERIENCE POST GRADUATE SCHOOL

7.      After graduate school, I worked as a quantitative analyst, First Union National Bank from November 1994 to June 1996; where I designed and coded up-trading and risk management models.

8.      I was a researcher for Intel Research, a division of Intel Corporation (NASDAQ: INTC) from June 1996–September 2006, ending up as a principal engineer. While there, I:

(a)      founded the Open Source Computer Vision Library ("OpenCV") that became the dominate computer vision library worldwide, beating out a Microsoft project and several Defense Advanced Research Projects Agency ("DARPA") and academic efforts;

(b)      introduced much more sophisticated machine learning algorithms to Intel's manufacturing processes in order to reduce testing time without sacrificing quality;

(c)      organized, coordinated, and led the vision team for Stanley, the robot that won the $2M DARPA Grand Challenge.[1] Stanley is now in the Smithsonian Air and Space museum; and

(d)      worked on and released the precursor code to the Intel Performance Primitives Libraries.

9.      From September 2006 to November 2007, I was the Vice President of Technology for VideoSurf. I architected their original video coding system and helped code their video search system. I left after a year. VideoSurf eventually sold to Microsoft in 2011.

10.      From December 2007 to 2012, I was senior scientist at Willow Garage. I developed applications running on Willow Garage's robot operating system ("ROS"), developed

---

[1] One of the team members I recruited was Dr. Adrian Kaehler, also then at Intel Corporation.

Computerlaw Group LLP
www.computerlaw.com℠

1   vision algorithms and did work on the PR2 (the Willow Garage product, or "Personal Robot,

2   version 2"), including work on perception for manipulation. By "perception for manipulation," I

3   refer to designing robots that see objects and their locations in space in order to be able to pick

4   up those objects and move and place them. I gathered a group of people internally to work on

5   robot perception-guided manipulation of boxes. That team became a separate company,

6   Industrial Perception, Inc. ("IPI").

7          11.    Since 2008, I have provided advisory and consulting work, and participated in

8   board activities across several technology companies. From 2008–2015, I started advising

9   Zeitera Corporation (sold to Gracenote/TribuneMedia in 2015). In 2011, I started serving on the

10  board of Occipital corporation, from 2012–2013, and I served as a consultant to Intel

11  Corporation, I also consulted for Applied Minds (AMI) during that same period. In early 2013, I

12  consulted for Itseez Corp., a Nizhny Novgorod-based computer vision and machine learning

13  contract firm, but have been an unofficial advisor for them 2010. As my public LinkedIn page,

14  **Exhibit B,** states, I have been:

15          (a)    a director of the OpenCV library since May 1999, which has an associated

16                 California corporation filed in June 2012 (in the process of converting to a

17                 non-profit), of which I am the President and CEO (listed as January 2012

18                 to the present on my LinkedIn profile). This company is virtual – there is

19                 no office and no equipment. The code and webpage exist on GitHub;

20          (b)    an investor, board member, and advisor of OpenCV.ai, a Delaware

21                 corporation, since April 2016 which has no relationship to OpenCV.org.

22                 My understanding is that it is changing the name to remove any confusion.

23                 I am solely an advisor, and stockholder, and board member for the

24                 Company. I have not and do not work on the code or development of any

25                 IP for that company.  Since being sued by Magic Leap, I was informed

26                 that, without approval of the Board of Directors, I cannot make, create,

27                 conceive, or reduce to practice any IP for this company.

28

Computerlaw Group LLP
www.computerlaw.com℠

12.     In my adviser roles, I never develop for the companies. Mostly the positions are in name only—they use it to help attract talent or for fund raising but I mostly never hear from them. A true and correct copy of my LinkedIn page, https://www.linkedin.com/in/garybradski, is attached as **Exhibit B**.

13.     I was a Consulting Professor in the Stanford Computer Science / Artificial Intelligence ("AI") Department for six years from August 2006−September 2012 where:

(a)     I taught Computer Vision and Robotics courses;

(b)     I performed research with a wide variety of Students and Professors;

(c)     I co-founded the Stanford Artificial Intelligence Robot ("STAIR") project at Stanford with Professor Andrew Ng, Sebastian Thrun, Daphne Kohler, and others who helped develop technology such as th PR1 that was eventually a factor. STAIR created the ROS operating system and the PR1 home robot that became the basis for Willow Garage; and

(d)     Earlier, I organized the vision team for Stanley, the robot car that won the $2M DARPA Grand Challenge race across the Southwestern desert of the United States. This spawned:

- Street view;
- Google Maps;
- The Google self-driving robot cars;
- Self-driving car efforts around the world; and
- Stanley the car now sits in the Smithsonian Air and Space museum.

14.     I had the idea, gathered a group of people and was one of the four co-founders at Industrial Perception, Inc. ("IPI") from March 2012–August 2013 and we:

(a)     Assembled the initial team from the staff at Willow Garage;

(b)     Found the initial market and customer base;

(c)     Worked on robots, marker detection and pose, barcode readers, welding tip measurement tools and worked towards the goal of robotic sensory guided pick and place in distribution centers; and

(d)     Sold it to Google in 1.5 years, in Summer 2013.

Computerlaw Group LLP
www.computerlaw.com℠

15.     I founded the OpenCV library. Since 1999, I have been its director and since 2012, its Chief Executive Officer. OpenCV is a free and open computer vision library that has advanced the field of computer vision around the world and is used in nearly every University in the world. In 2014, OpenCV won the IEEE PAMI Mark Everingham prize for contributions to the field of computer.

16.     I founded and still run the statistical Machine Learning Library that now ships with OpenCV.

17.     I wrote the book, LEARNING OPENCV: COMPUTER VISION WITH THE OPENCV LIBRARY, published in 2008, with Dr. Adrian Kaehler. It was the best-selling text in computer vision and machine learning for several years. The second edition is due this Summer 2016. A copy of the Table of Contents, available online at https://library.oreilly.com/book/9780596516130/learning-opencv-1st-edition/toc,  is attached as **Exhibit C**.

18.     My work on the robotics and perception concept that became the Robotics Actual project predates my employment with Magic Leap. A proposal by Dr. Kaehler, Dr. Pieter Abbeel (UC Berkley), Ms. Maja Mataric (USC), and myself was submitted to the NSF's National Robotics Initiative in 2011. For Robotics Actual, the idea was to create a new type of robot and leverage the academic community to find ways to control it. Professor Pieter Abbeel (UC Berkeley) was to be an advisor and Professor Ken Goldberg (UC Berkeley) was going to have all his students work on grasping problems with the resulting arms. The general idea of the NRI proposal that is so relevant to Robotics Actual was actually pitched to Mr. Hassan when he was then the head of Willow Garage and he and other people came to visit AMI to see an example of such an arm. Mr. Hassan is now a large shareholder in Magic Leap giving him a board position.

19.     My 2011 resume disclosed my research work in this area while at Willow Garage:

> Robotics: Perception for Manipulation. Goal is to "Master Manipulation"—combine rich 2D+3D sensing feeding advanced perception on inexpensive, capable arms running state of the art manipulation stacks in order to enable a new industry in perception driven manipulation.
>
> Exec Summary:

Computerlaw Group LLP
www.computerlaw.com℠

1 • Leading the Perception for Manipulation team at Willow Garage.

2 **Exhibit D** is a true and correct copy of this 2011 resume.

3       20.       Mr. Hassan recruited me to Magic Leap. From August 2013 to May 2016. I was

4 the Vice President, Computer Vision and Software at Magic Leap, Inc. (there were various title

5 changes over time, software was dropped for Machine Learning etc.) where I started their Silicon

6 Valley office, known internally as "Magic Leap West," or more simply now, "Mountain View"

7 ████████████████████████████████. I also started, and led for a while, the

8 original software, computer vision, machine learning, and Deep Learning teams. I hired the core

9 leaders, Jean-Yves Bouguet in computer vision and Adrian Kaehler for software development.

10                    <u>ACCOMPLISHMENTS AT MAGIC LEAP</u>

11       21.       Dr. Kaehler, Jean-Yves Bouguet (my senior hires) and I found that the code base

12 and algorithm base was almost non-existent. The existing software was quirky, supposedly very

13 efficient, but by any mature judgement, a disaster.

14       22.       I asked Dr. Kaehler to run the software team, to quickly put into place better

15 system code.

16       23.       We needed staff, but because of a slow and leaky HR and approval process, it was

17 difficult to bring people on board. Due to this, I spent more time than I wanted recruiting.

18 Nevertheless, I built the vision team, recruiting and training Jean-Yves Bouget as its leader and

19 hired ██████████████ to get ████████████████ underway. Magic Leap's

20 technology depended on ██████████████████.

21       24.       Dr. Kaehler and I also managed to get demos up and running quickly, and started

22 sprint developments with the vision, software, and game groups.

23       25.       Through Summer 2014, Magic Leap's actual hardware team based in Florida

24 seemed to be having difficulties making AR headsets for use by Magic Leap personnel. To adjust

25 for this, we had ████████ and ████████████ on our software team, but whom were capable of

26 hardware development, start building hardware, based on military grade helmets, and lit-eye

27 night vision displays to allow our vision team to add sensing and tracking algorithms and code in

28 order to be able to overlay reality with registered images. We never intended this hardware to be

Computerlaw Group LLP
www.computerlaw.com℠

1  a product, just a development system for internal workers until the actual product came in

2  volume enough for everyone to wear and use daily for development. Our systems were being

3  rapidly improved, such as ███████████████████████, but this was abandoned

4  around Fall 2014 when headquarters made it clear they did not want us to use these temporary

5  development machines.

6       26.    From then on, we were hardware starved in Magic Leap West until the day I left.

7       27.    In October 2014, Dr. Kaehler and I helped develop the product demos for

8  Company's Series B financing round. Dr. Kaehler and I personally demoed for the potential

9  investors totem tracking (ray gun), head tracking with a helmet, 3D room model capture, and

10  tracking within the captured model.  We had built an extensive code base, which I prepared for

11  Google's audit, refining hyperlinked wiki pages that could be used to drill down quickly from

12  general overview of a code section down into any segment of code. We met with the Google

13  team for its "deep dives," in which Google engineers drilled down through the algorithm stack to

14  vet the quality of the code. They were impressed and the Series B closed with Google leading.

15  This was a key factor in the publicly touted $542M Series B fund raising. In my experience,

16  investors, especially Google, do not put in money if they think a company has a bad code base or

17  incompetent algorithm team.

18       28.    To my recollection, at some point around this time, I had dinner with CEO Rony

19  Abovitz and his family and explained that since we track the user's eye███████████████

20  ██████████████████████████████████████████ that might

21  become a large source of revenue for Magic Leap. Rony very much liked the idea. Dr. Adrian

22  Kaehler and I wrote some patents on this together. When Dr. Kaehler was assigned to VP of

23  Special Projects, he carried this idea further in much detail.  I gave him use of some contractors

24  from my team for his "team" since he was never allocated any personnel for his task. I still

25  believe this could be the biggest money maker for Magic Leap in the future, better than ██████

26  ████████████████████████████████████.

27       29.    In early 2015, some months after the B round, Jean-Yves Bouguet and I went to

28  Florida; our purpose was to have a meeting with the CEO, Rony Abovitz. We presented ideas to

Computerlaw Group LLP
www.computerlaw.com℠

1   increase efficiency and productivity for the Company in Magic Leap West by giving us back

2   more autonomy: authority to manage our teams and to innovate. I thought the meeting with Rony

3   was encouraging, but afterwards, the Company assigned me to work on "N+1 tech" or

4   "Advanced Tech" with only a skeleton team: some remnants of my old gesture team and some

5   contractors. Jean-Yves Bouguet and the vision team under him was transferred off to report to the

6   software team. I initially had no hiring tokens to hire any more engineers to do the work I was

7   assigned. I had to fight to get the authority to hire any more personnel.

8        30.    Dr. Kaehler was assigned to work on ████████████████, and similarly

9   found himself without any team at all other than the contractors I lent him to direct. In this way,

10  Dr. Kaehler needed at least some engineers to get some of his ██████ and patenting work

11  done and I proactively made that happen.

12       31.    If I recall correctly, by Spring 2015, I was running a research "group," albeit with

13  no explicit objectives beyond "Advanced Technology." I became concerned that the field of

14  Deep Learning (the new and much more successful form of Artificial Intelligence, also called

15  "deep net") was exploding, but Magic Leap, to my knowledge had no efforts in it at all, and no

16  senior manager existed who even knew of the field. I made it my mission to build up a Deep

17  Learning team for Magic Leap. It was difficult to recruit top people in the deep net field to Magic

18  Leap, since everyone external wanted to live in New York or in Silicon Valley, but Magic Leap's

19  base of operations is in Florida, and the HR department there seemed to be offering only

20  relocation to Florida to the people not already in Silicon Valley. We lost several deep net hires

21  that I thought would be key leaders because of this. I also had to keep pushing for an equipment

22  and hire budget from Magic Leap for my team. I knew we would also need a systematic effort in

23  data collection and so needed equipment and a sub-team for that too. We also needed on the

24  vision side to have equipment for a systematic method of calibration as people were getting

25  inconsistent results.

26       32.    In the face of these obstacles, I was able to help recruit Andrew Rabinovich. He

27  became the anchor to build the deep net teams, and I planned to transition him to lead the team

28  ultimately.

Computerlaw Group LLP
www.computerlaw.com℠

33.     My last 18 months included research to address the problem of porting software code to the rapidly proliferating embedded hardware.  I was looking at developing "functional languages." These are software languages that are dependency free and so easier to write compilers for, but harder for humans to write programs on. But, by reviewing existing functional languages, I could see that as long as a language were found that naturally handled arrays of data, it would be easy to express images and AI data structures in it, it would therefore be easy enough for people to write code in such a language.  Then, manufacturers could write compilers for each new embedded architecture and use the compilers to optimally run ("to port") the AI or computer vision code onto the new embedded hardware. That doing this would help was proven by Magic Leap taking over a year just to port existing code to one hardware architecture called ▇▇▇▇▇.  That seemed to me to be such a huge bottleneck in time and money that it was worth looking at functional programming.  However, this would be a long-term project.  I had one of my contractors see if he could experiment with some open source code bases, but I estimated it would take a couple of people three years to complete this project.  Along the way, I found that Professor John Canney at UC Berkeley for deep neural networks, and Professor Kunle Olukotun at Stanford for computer vision, had similar ideas that are being developed as open source..

34.     I was also coming up with ideas in a notebook (sequestered) but our patent attorney David Lundmark was only coming in randomly; and when he did, I felt Adrian Kaehler in ▇▇▇▇▇▇▇▇▇▇ or my own group in deep neural networks had higher priority.  I was also going through considerations for what a ▇▇▇▇ augmented reality database would look like.  This last effort was blocked, waiting to get enough augmented reality headset hardware built so that most employees could use it day to day in order to test out geographic database ideas.  To advance this end, I pushed for making 30–50 more headsets to get common headset usage started in the Company at Mountain View.  This hardware still has not arrived as far as I know.

## Magic Leap Does not "Own" OpenCV Library or Technology

35.     As I said, I developed OpenCV as a third party, open source library more than a decade before Magic Leap even existed, and in 2012 created a company to help maintain it:

Computerlaw Group LLP
www.computerlaw.com℠

1   OpenCV.org.  Neither the OpenCV code library nor the company belongs to Magic Leap.

2   OpenCV is released under a BSD license and is free for both academic and commercial use. It

3   has many users in many different fields and applications.  All this is publicly stated right on the

4   OpenCV website:

> 5   OpenCV is released under a BSD license and hence it's free for both academic
>     and commercial use. It has C++, C, Python and Java interfaces and supports
> 6   Windows, Linux, Mac OS, iOS and Android. OpenCV was designed for
>     computational efficiency and with a strong focus on real-time applications.
> 7   Written in optimized C/C++, the library can take advantage of multi-core
>     processing. Enabled with OpenCL, it can take advantage of the hardware
> 8   acceleration of the underlying heterogeneous compute platform. Adopted all
>     around the world, OpenCV has more than 47 thousand people of user community
> 9   and estimated number of downloads exceeding 9 million. Usage ranges from
>     interactive art, to mines inspection, stitching maps on the web or through
> 10  advanced robotics.

11  **Exhibit E** is a true and correct copy of http://opencv.org/ and http://opencv.org/about.html.  The

12  book Adrian and I wrote was published years before we went to Magic Leap, in 2008. It was not

13  written "for" Magic Leap or "at" Magic Leap in any way.

14              **I CONSIDER MY FUTURE WITH MAGIC LEAP**

15      36.     By mid-Summer 2015, I considered leaving. During this time, the Company was

16  in its C-Round fund raise and I did not want my departure to in any way hurt the Company in

17  that process. I had informed Scott Hassan and company counsel David Lundmark that I was

18  going to leave, but David Lundmark convinced me to wait. Little did I know that what I hoped

19  would be a summer of fund raising for the C round instead would not complete until February

20  2016.

21      37.     I continued mulling over ideas, continuing patenting, and trying to recruit talent

22  for Magic Leap to build a machine learning team. I spent time trying to hire the real luminaries

23  of Deep Learning such as ▮▮▮▮▮▮ whom I credit myself with for having wooed away from

24  ▮▮▮▮▮. Having put in so much work attracting him, I was very discouraged when Magic Leap

25  would not hire him. I might have stayed on to work with him, since he is so creative. We also had

26  ▮▮▮▮▮▮ interested, who is a student of Deep Learning's top expert Yann Lecun. Magic

27  Leap lost out on ▮▮▮▮▮ to Google Brain because of relocation issues to Silicon Valley and

28

Computerlaw Group LLP
www.computerlaw.com℠

1  due to delay in getting back to him. These things embarrassed and demoralized me since lining

2  up and wooing talent is hard work.

3       38.    However, I worked hard to keep morale up on my team, and lost only one person,

4  ███████████████████████████████████████████████████████████. I spent a

5  lot of time dealing with convincing disgruntled and frustrated employees to stay, which was

6  increasingly tough on me. Some people from the vision team told me that they wanted to join me

7  wherever I went next, but I dissuaded them. Magic Leap had scheduled a second market stock

8  buy so that employees could get some liquidity, but like the protracted C-round fundraising, the

9  second market took months to materialize.

10      39.    I continued to write patent ideas in the notebook that I have given to my attorneys,

11  who returned it to Magic Leap. There are 20−30 patent sketches written there.

12  **I TELL MAGIC LEAP'S CEO OF MY PLANS TO DEPART AND MY NEXT PROJECT**

13      40.    Over my 2016 vacation, I mulled whether I had it in me to stay.  Any machine

14  learning database project could not get started until Magic Leap built enough of its AR glasses

15  for most employees to regularly use them day-to-day. That seemed to me to be too far in the

16  future to be worth staying. I finally decided that it would be more creative leaving to pursue my

17  own projects.  I had not formally disclosed plans for doing a geographic Deep Learning AR

18  database, but I sketched some notes in my notebook (later turned over to my lawyers and

19  returned to Magic Leap; my lawyers also requested, multiple times, in writing, an exit interview

20  where such disclosure could occur, but Magic Leap refused and ignored these requests.

21      41.    In April 2016, I traveled to Magic Leap's headquarter offices in Fort Lauderdale,

22  Florida and met in person with Rony, telling him that I planned to leave, and that my next project

23  would be a robotics company, Robotics Actual. Rony asked if I was intending to poach anyone

24  from Magic Leap. By way of permission, I told him I had discussed the robotics idea with two

25  people on the Deep Learning team.  Rony did not seem to object.  When it became clear only a

26  couple of weeks later, well after this meeting with Rony, from the company lawyers that there

27  were strong objections, all discussions were dropped.  The two people I had talked to about

28  Robotics Actual are still working at Magic Leap.  I also told Rony that there were a number of

Computerlaw Group LLP
www.computerlaw.com℠

1   other individuals on the computer vision side, who wanted to follow me no matter where I went,

2   but I was not poaching them; that I did not want them leave to Magic Leap; and that I would, and

3   I did, discourage them.

4         42.     From this meeting, which went well according to my understanding, I understood

5   that:

6              (a)     Magic Leap had no interest in doing this project themselves as they

7   suggested that they might invest something in Robotics Actual and that potentially Magic Leap

8   could be a first customer to attempt to help in the assembly of future Magic Leap products — I

9   told Rony that would be a great goal, but our robotics idea was so new and unconventional, he

10  should not depend on us solving any production problem for Magic Leap for its first product;

11             (b)     Magic Leap seemed clear that there was no objection to Dr. Adrian

12  Kaehler leaving amicably, too, as they quickly offered us advisor agreements; and

13             (c)     Magic Leap would generally and Rony would specifically consider

14  whether some role such as an Advisor if (Dr. Kaehler and I) were able to actually find funding

15  for the project in Silicon Valley (to date, that has not occurred and the litigation by Magic Leap

16  seems clearly designed now to prevent that from eveer happening). Of course, during the next

17  one or two years, other companies will fill out this potential if we do not and it will all be a moot

18  point. I felt Rony's first response was a great one: invest and partner. That is what Willow

19  Garage did when I created the future IPI that spun off. Scott was a board member in both

20  companies and I hardly expected from this that there would be such radically different outcomes.

21  IPI made money for everyone involved; Robotics Actual would seem to only be making money

22  for lawyers under Magic Leap's approach.

23        43.     I was happy with the discussion when I departed, for a conference where I was

24  giving a talk. I came back to demand from Magic Leap for a draconian separation agreement

25  where Magic Leap would non-exclusively own all my IP that I would create in the next two

26  years in Magic Leap's field of use. This field of use was defined so broadly and vaguely that in

27  emails with corporate general counsel attorney Mark Albert, it would include any deep nets

28  (though deep nets are a technique, not a trade secret or protectable IP in a generic sense) or

Computerlaw Group LLP
www.computerlaw.com℠

1   computer vision work along with rights to audit what I was doing at any time including right to

2   audit the books of third parties that I may work for, even though I would not have such rights to

3   grant! I could not sign that document for that fact alone; I cannot compel third parties to show

4   their books. Signing this agreement would mean I could not work in my field at all, nor create

5   companies in my field. As it is, we will not be able to get funding for Robotics Actual. I frankly

6   do not know what happened between the date of my meeting which ended amicably with Rony

7   and events which occurred during the following week (while I was giving a talk in Shenzhen,

8   China in a pre-planned trip as pro bono work that I have done for the open source community

9   and to which Magic Leap did not object).

10          44.     However, it was clear that Rony had changed his mind by 180 degrees without

11  communicating at all with me because they had turned off my Magic Leap email, ended my

12  access rights to Magic Leap's offices, and otherwise totally and wrongfully terminated my

13  employment without any notice whatsoever except one that made clear that they would not honor

14  and would treat as forfeited my stock rights in Magic Leap, which I conservatively estimate to be

15  valued at over $██████ dollars.

**MAGIC LEAP DOES NOT "OWN" DEEP LEARNING OR**

**HAVE EXCLUSIVE CLAIM TO ALL APPLICATIONS OF DEEP NEURAL NETWORKS**

18          45.     From the pleadings, I get the feeling that Magic Leap does not know what deep

19  neural network tech really is.  There are internal people, whom I recruited as technical experts,

20  who can clarify or verify the following points:

21          46.     Deep network libraries are tools, and are developed and maintained not by Magic

22  Leap, but third parties.  The best known are: TensorFlow (maintained by Google), Caffe

23  (maintained by UC Berkeley), Torch (maintained by Facebook).  These deep neural network

24  tools for learning neural network models of data are analogous to what compilers were for **C++**

25  **and code**. One develops models and collects data (**or analogously writes code**) and trains it

26  using the libraries (Tensor Flow, Caffe, Torch) (**analogously compiles it**) to produce a trained

27  network (**analogously executable application**) which are the real things of value.

28

Computerlaw Group LLP
www.computerlaw.com℠

47.     Deep neural networks are developed for the particular use of the company developing it, and can be as different one from one another as, say, **accounting software is from software game code**.

48.     Deep neural networks are evolving shockingly fast — benchmarks fall to the next technique or model every single competition and conference. What is used today will be replaced by a new model next year almost certainly. Magic Leap's best models today almost certainly will be quite modified or replaced and trained on wholly different data by product ship date and beyond.

49.     Deep Reinforcement Learning is a subfield of Deep Learning, and no one in Magic Leap is using or even knows how to do that, to my knowledge. Neither Adrian nor I do either. It exists right now at UC Berkeley and in other companies, such as DeepMind, which has been widely covered even in the popular press. **Exhibit F** is a true and correct copy of an article from March 2016 by the Economist marking DeepMind's AI computer program, AlphaGo, contest with a human player, champion Lee Sedol. *Artificial intelligence and go: A game-changing result,* THE ECONOMIST, Mar. 19, 2016, online at http://www.economist.com/news/science-and-technology/21694883-alphagos-masters-taught-it-game-electrifying-match-shows-what. **Exhibit G** is a collection of articles by GoGameGuru, available at https://gogameguru.com/go-news/computer-go/, which covered the multiple-game contest in March 2016.  Most people who know this area are students who have not graduated yet. Deep Reinforcement Learning (very different from deep neural networks) is useful to control things like a robot arm, but I do not see it as an obvious or efficient tool for AR/VR.

## Magic Leap Has No Robotics Projects or Projects or Plans for Developing Robots

50.     Magic Leap was not, and to my knowledge, was not and is not working in perception driven robotics (one of my own and Adrian's areas of long-developed academic and professional expertise and experience) and has no resources allocated nor plans to do so.

51.     The commercial robots currently purchased by Magic Leap are tools I fought to have the budget to purchase. I was the one who purchased them for the purpose of assisting in

Computerlaw Group LLP
www.computerlaw.com℠

1    automating calibration and data collection for Magic Leap's AR product. This has to do with

2    using robots as a tool, not in any sense developing a side area of industrial robotics.  With my

3    budget, I had my team buy a Vicon system, a super accurate motion tracking system that could

4    cover a large area. This started in my group with my direction and moved to the software group.

5    This, along with the robots, began to be used for systematic "ground truth" motion and pose data

6    collection so we could accelerate the pace of development by having good, repeatable data. This

7    was another key thing I helped bring into the Company. The robots were also used in calibration

8    automation because I could see that most of the time when people claimed, "calibration wasn't

9    working," they were just doing a sloppy job calibrating the cameras. With the robots, we could

10   design a proper calibration once and for all. These are in active use to this day. Florida liked this

11   so much, they had our robots transferred there, and we in Mountain View had to wait and buy

12   new ones. Beyond using commercially available robots as tools to collection motion data and to

13   calibrate cameras, there were no robotics projects I was aware of at all in Magic Leap. I do not

14   think any existed.

15   **ROBOTICS ACTUAL WAS A PRE-EXISTING IDEA FOR A VENTURE BASED**

16   **ON PUBLISHED OUTSIDE RESEARCH AND EXPERTISE MAGIC LEAP DOES NOT OWN**

17        52.      The company, Robotics Actual, Inc., was just a shell with:

18            (a)      no funding,

19            (b)      no data,

20            (c)      no code,

21            (d)      no robots,

22            (e)      no models,

23            (f)      no computers, local or distal,

24            (g)      no GitHub account,

25            (h)      no employees,

26            (i)      no intellectual property,

27            (j)      no customers,

28            (k)      no revenue,

Computerlaw Group LLP
www.computerlaw.com℠

1    (l)    No business contracts, nor customers,

2    (m)    no math,

3    (n)    No patents of any type,

4    (o)    and no Magic Leap IP.

5    53.    It was just a resurrection of Adrian's and my older ideas for a company to make a

6    new kind of cable-driven robot. We intentionally put no work into the company as described in

7    the list above.

8    54.    We expected that we would need talent in Deep Reinforcement Learning

9    (distinctly different from just Deep Learning) since for our planned cable driven robot, cable

10    movement by itself is not accurate or repeatable, a well-known problem with such technology

11    and the reason that technology was abandoned decades ago for the "ball and stick" industrial

12    robots we have today. Nothing was decided; we had not decided where exactly these robots

13    would be used and what exact problem they should solve; all that would involve spending

14    months visiting factories in order to identify what real problems existed for which factory people

15    are motivated to pay money.

16    55.    Again, it was just a general idea for a project and not a new idea in any way: the

17    company itself derives from a company that Dr. Kaehler, Dr. Pieter Abbeel, an Associate

18    Professor at University of California, Berkeley, and I were thinking of doing in and around 2012,

19    well before Dr. Kaehler and I got derailed by joining Magic Leap and well within our pre-

20    employment rights. The only thing "new" since we last explored this idea is the Deep

21    Reinforcement Learning technology that developed only recently by Dr. Abbeel's group at UC

22    Berkeley—not by me, not by Dr. Kaehler, and not by anyone at Magic Leap. To my knowledge,

23    the only known pre-existing technology for this field exists at UC Berkeley, at Google Deep

24    Mind, a group at Google X and some at other university labs and now at OpenAI. I expect it will

25    start to spread at an increasing rate.

26    56.    The entire value of Robotics Actual lay in the people of who were driving it and

27    that was Dr. Kaehler and myself.

28

Computerlaw Group LLP
www.computerlaw.com℠

57.     Magic Leap was not, and to my knowledge, is not working in Deep Reinforcement Learning, in the context of perception robotics or otherwise, and has no resources allocated nor plans to do so.  A robotics application, such as a developing sensor driven, cable actuated arms (that do not allow for repeatable "blind" operation) would not have "vision" code separate from the arm+camera robot system. The inputs and outputs of the models are commingled and the neural network models would be specific for the robot hardware in which they are embedded.  Accordingly, it does not make sense for Magic Leap to claim that this code, which does not even exist yet, should be covered in Magic Leap's AR hardware field of use. Magic Leap does not have a robot arm+camera system, and a robot arm+camera system is not AR hardware.

58.     The company shell itself was created only so we could try to get the top Deep Reinforcement-Learning people interested. The attached screen shot is the bank account for Robotics Actual at Wells Fargo Bank. Other than the initial $800 opening deposit on 05/05/2016 as shown in **Exhibit I**, a true and correct copy of the bank account transaction log, there has never been any other transaction since the corporation is just an empty shell.

59.     Many companies, once they are manufacturing their product, buy robotic arms to help automate production, but that is a system integrator's work.  It is very distinct from creating a new cable-based robot arm, and employing Deep Reinforcement Learning experiments in order to control that arm, followed by finding a market for it.

### OPENCV.AI WAS WRONGLY SUED

60.     Magic Leap has also added OpenCV.ai, a company my longtime friend, Ethan Rublee (from Google Summer of Code, Willow Garage, and Industrial Perception, Inc.) quit Google X to found putting himself as CEO and me as co-founder but really with just a board/ advisor position. I contributed a small investment. Magic Leap again claims IP or trade secret theft or conversion without specifying what those secrets were. But, all the technical ideas and direction in OpenCV.ai (soon to change names) come entirely from Ethan Rublee. He still had large bonuses vesting at Google and I went over for beers one night with no expectation and no

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com℠

1   ask that he leave Google. I just complained to him about needing to change OpenCV.org so that

2   it could achieve more of its educational objectives rather than just hosting the code base.[2]

3       61.     Instead, I found that Ethan Rublee had <u>already</u> built up interesting tech in his

4   garage on his time, and I was floored when he said he would quit and create such a company

5   around his tech and include me in it (we had a great working relationship at Willow Garage

6   where I hired him and then at Industrial Perception Inc. that we co-founded together). Ethan has

7   a private code directory on GitHub that contains his early work starting February 2016, long

8   before we talked.

9       62.     I have contributed no code, no algorithm, no models, no math, no technical

10  contributions, no business plan, no pitch decks, nor have I leveraged anything nor anyone from

11  Magic Leap to do so. I told Ethan nothing about Magic Leap's technology and he did not ask.

12  You can see all the current contributors to OpenCV.ai on their GitHub account, see **Exhibit H**

13  provided to me by Ethan, a true and correct copy of the OpenCV.ai GitHub page showing the

14  contributors, none of whom come from Magic Leap. I have never downloaded OpenCV.ai's

15  code. After I left Magic Leap, I helped Ethan hire a guy (unconnected to Magic Leap) who

16  approached me from LinkedIn, and I helped Ethan look at office space after I left Magic Leap.

17  As a board member, I helped him work through, strategically, whether he should aim general or

18  narrow for a first product application.

19      63.     OpenCV.ai's code base would prove there is no Magic Leap technology nor

20  secrets there, nor contributions from anyone at Magic Leap, rather, as has been explained to me,

21  most of the code comes from open source sites and/or is the original work of that team.

22      64.     To be clear, OpenCV.ai has nothing to do with OpenCV.org.  There are no

23  business agreements, nor links of any kind between the two entities, and OpenCV.ai will soon

24  change its name to reflect this.

25

26

---

27  [2] I had toyed with the idea of having OpenCV.org support its educational mandate by selling an
    educational camera kit and allow people to deploy such inspection cameras. There are no trade
28  secrets or IP in this, people have already done this as a business, for example with the Raspberry
    PI: http://www.lanoptik-camera.com/#!industrial-camera/c5zs.

65. Right after my termination, I delivered my work computer, that Magic Leap requested be returned, to Magic Leap. I delivered my notebooks to my attorneys for return to Magic Leap. Examination of them will reveal no code nor development for either of these companies. Indeed, OpenCV.ai was totally unplanned by me as it was all Ethan Rublee's idea as he will state.

### MAGIC LEAPS FALSE ACCUSATIONS

66. I categorically deny taking or making any use of Magic Leap trade secrets or IP in establishing any company and also categorically deny developing on my or company time any part of the Robotics Actual product that, as noted above, had no source code, no source materials, no design documentation, no intellectual property and no funding. It was a project idea with a slide deck in PowerPoint that collected up the issues—all of which are well-known, readily ascertainable and already in public domain.

67. Also, I categorically state under oath that I always understood that the consulting freedom provision which was specially written into my agreement and which when coupled with my long history of doing independent projects, advising, networking, creating, which is why I am well known in Silicon Valley provided me with clarity that there would not be any problem with anyone at Magic Leap — particularly given the long hours I otherwise gave Magic Leap and particularly given the fact that there was never once a suggestion ever that Magic Leap was heading into the field of robotics.

68. I had the idea to remove my fund raising burden to support the public, free and open computer vision algorithm code base OpenCV (with around 250,000 downloads a month and 10's of millions of downloads around the world). I intended to package OpenCV's existing code, allow people to buy a Raspberry Pi-like device and use it for educational and for factory product monitoring. This idea was dropped and was never pursued and there are no plans to pursue this course for OpenCV.org. Ethan Rublee had developed technology for things I never thought of and he has entirely lead its technical focus and development. He only took the similar name, OpenCV.ai, because he thought it might be better for marketing. My understanding is that he has since thought better of this and is renaming the company. I do not work for OpenCV.ai,

1 nor do I develop for the company nor do I contribute IP. I have done no design and no

2 development for OpenCV.ai (as I said, soon to be renamed) at all.

3      69.    There is no basis for the allegations accusing me of making false statements about

4 or interfering with Magic Leap's potential relationship with Kleiner Perkins.

5      70.    At no time have I ever transferred or disclosed any Magic Leap confidential

6 information to OpenCV.ai, R/A, Ethan Rublee, Pieter Abbeel, Kleiner Perkins, or any other third

7 party.

8      71.    I have openly listed a number of companies that I advise on LinkedIn. Nothing

9 has ever been said to me about these activities by Magic Leap. **Exhibit B** is a true and correct

10 copy of my LinkedIn page.

11      72.    I believe that the motivation for these bad faith accusations is an attempt to obtain

12 a forfeiture of my valuable stock rights.

13      I declare under penalty of perjury that the foregoing is true and correct and that this

14 declaration was executed in Palo Alto, California on July 25, 2016

15

16                              */s/ Gary Bradski*

17                                Dr. Gary Bradski

18

19      Under Civil Local Rule 5-1(i)(3), I attest under penalty of perjury that concurrence in the

20 filing of this document has been obtained from the signatories indicated by a conformed

21 signature (/s/) within this e-filed document.

22                           */s/ Christopher Sargent*

23                             Christopher Sargent

24

25

26

27

28

*Computerlaw Group LLP*
www.computerlaw.com℠