1  Jack Russo (Cal. Bar No. 96068)
   Christopher Sargent (Cal. Bar No. 246285)
2  COMPUTERLAW GROUP LLP
   401 Florence Street
3  Palo Alto, CA 94301
   (650) 327-9800 office
4  (650) 618-1863 fax
   jrusso@computerlaw.com
5  csargent@computerlaw.com

6  Attorneys for Defendants
   ADRIAN KAEHLER, GARY BRADSKI, AND ROBOTICS ACTUAL, INC.
7

8            IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 MAGIC LEAP, INC., a Delaware corporation,

12              Plaintiff,                     Case No. 5:16-cv-02852-NC

13     v.                                     **DECLARATION OF DR. ADRIAN KAEHLER IN
                                              SUPPORT OF DEFENDANTS' MOTION TO
14 GARY BRADSKI, an individual, ADRIAN        DISMISS FOR FAILURE TO STATE A CLAIM
   KAEHLER, an individual, ROBOTICS ACTUAL,   (RULE 12(B)(6)); ALTERNATIVELY, MOTION
15 INC., a Delaware corporation, and          FOR A MORE DEFINITE STATEMENT (RULE
   OPENCV.AI, a Delaware corporation,         12(E)); AND/OR MOTION FOR SUMMARY
16                                            JUDGMENT (RULE 56) AS TO CLAIMS 1–4;
                Defendants.                   MOTION FOR SUMMARY JUDGMENT AS TO
17                                            CLAIMS 5–10**

18

19

20

21

22            **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

23

24

25

26

27

28

Dr. Kaehler R.12 & 56 Decl.                                    Case No. 5:16-cv-02852-NC

Computerlaw Group LLP
www.computerlaw.com℠

I declare, under penalty of perjury, as follows:

1. My name is Adrian Kaehler, and I sometimes go by Dr. Adrian Kaehler (I have a Ph.D.). I am over the age of 18. I make the statements here of my own personal knowledge and I believe them to be true. I could and would testify competently if called as a witness. I am a Plaintiff in the first-filed declaratory relief lawsuit, *Bradski et al. v. Magic Leap, Inc.*, No. 16-cv-295461 (Santa Clara. Super. Ct. May 23, 2016), removed as N.D. Cal. No. 5:16-cv-03235 EJD, where I sought to obtain answers to questions regarding the rights to do consulting under the express "free to pursue ongoing consulting work" terms (the "Consulting Rights") of my Magic Leap Agreement; a true and correct copy of my agreement is attached as **Exhibit A**. I am a Defendant in the later-filed *Magic Leap, Inc. v. Bradski et al.* action, No. 5:16-cv-02852-NC.

SUMMARY OF EDUCATION, EXPERIENCE, AND EXPERTISE BEFORE MAGIC LEAP

2. I have and had over 20 years of education, work experience, and expertise in the area of computing, mathematics, artificial intelligence, and robotics *before* I accepted employment with Magic Leap — employment I would not have accepted without the "right to consult" provision as part of my agreement and without the stock rights that were granted to me:

(a) 1988–1992 B.A. Physics, University of California in Santa Cruz, thesis in experimental particle physics;

(b) 1992–1997 Ph.D. Physics, Columbia University, thesis in computational theoretical particle physics;

(c) 1998–2006 Intel Corporation – CAD, Automation, VLSI Design, later computer vision and machine learning;

(d) 2006–2007 Stanford University – Visiting Scholar, Stanford Artificial Intelligence Lab;

(e) 2006–2013 Applied Minds, Inc. ("AMI") – VP Robotics; and

(f) October 2013–May 2016 Magic Leap, Inc. – VP, Technology Solutions & Member of Technical Staff, Computer Vision, then VP Core Software, later VP Special Projects.

3.      Of special note along that timeline, I won a Gordon Bell prize for my work in supercomputing in 1998, was part of the winning team for the robotics DARPA Grand Challenge competition in 2005, and published a book on computer vision in 2008 which, imminently, will be released in its second edition.

4.      Also of note, while at AMI (though the details are confidential) I did extensive work in Virtual Reality ("VR"), primarily under contract from ███████████████ and in Augmented Reality ("AR") primarily under contact from ███████████. During that time, I handled sensitive government information on projects for the military in that space as well. My many robotics and robotic sensing projects in this time are discussed further below.

### The Pre-existing, Published OpenCV Computer Vision Library
### And Learning OpenCV Books Authored with Dr. Bradski

5.      I have long and publicly disclosed expertise with the OpenCV computer vision library, which is an open source, publicly available code base primarily developed by Dr. Bradski. It is licensable at "http://opencv.org/license.html" which states:

> OpenCV is released under a BSD license and hence it's free for both academic and commercial use. It has C++, C, Python and Java interfaces and supports Windows, Linux, Mac OS, iOS and Android. OpenCV was designed for computational efficiency and with a strong focus on real-time applications. Written in optimized C/C++, the library can take advantage of multi-core processing. Enabled with OpenCL, it can take advantage of the hardware acceleration of the underlying heterogeneous compute platform. Adopted all around the world, OpenCV has more than 47 thousand people of user community and estimated number of downloads exceeding 9 million. Usage ranges from interactive art, to mines inspection, stitching maps on the web or through advanced robotics.

6.      I and many others have worked with this code, and again, my expertise is both publicly disclosed, and predates my employment at Magic Leap. For example, I am the author, with Gary, of a treatise, Learning OpenCV: Computer Vision with the OpenCV Library, published by O'Reilly Media in September 2008. **Exhibit B** is a true and correct copy of the cover and information about this book, available at http://shop.oreilly.com/product/9780596516130.do?sortby=publicationDate. A 2016 new edition of this work i forthcoming. **Exhibit C** is a true and correct copy of my author page by O'Reilly

Media, available at http://www.oreilly.com/pub/au/3271. I have no involvement with the company OpenCV.ai, Inc.

7.   For many years, going back to at least 2008, Dr. Gary Bradski and I have had a shared interest in building inexpensive robots that would be suitable for large-scale manufacturing, commercial, or even consumer use. For example, a typical, modern manufacturing robot of the kind used in automobile manufacturing might cost many tens or 100s of thousands of dollars. The problem with which we were fascinated was the problem of building useful robots whose final cost was only hundreds or thousands of dollars: the price of consumer electronics.

8.   While at AMI, I worked on a number of projects that were instrumental in developing my understanding of the class of what we have come to call "marionette" robots[1] that were later to become the foundation of what Gary and I were thinking of doing with Robotics Actual, Inc. ("Robotics Actual"), a company that is being dissolved because this litigation has destroyed the ability to fund or staff it. Robotics Actual has precisely $800 in its bank account.

9.   In fact, an attempt was made in August 2011 to advance a proposal with the National Science Foundation ("NSF") to do almost exactly what Robotics Actual was going to do. However, at that time, we proposed a different class of algorithms[2] for the control of these robots. That proposal was rejected by the NSF. Crucially, the specific machine learning techniques that we had proposed to use in 2011 are different from the Deep Reinforcement Learning Techniques Robotics Actual proposed to use in 2016 as Deep Reinforcement Learning had not yet been invented in 2011. That proposal did involve the same people Dr. Bradski (then at Willow Garage), and Dr. Pieter Abbeel at the University of California, Berkeley (a once-hoped-for advisor to Robotics Actual), and myself, and consider the same "affordable robots" problem; however, as described above, any attempt would need to test and experiment[3] on using Deep Learning tools that have been developed and published since the NSF proposal. Since the

---

[1] This is a class of robots used in Hollywood to create creature special effects in films.
[2] Such as, for example, Gaussian process models.
[3] None of this testing or other experimentation has occurred or can occur given the litigation by Magic Leap.

Dr. Kaehler R.12 & 56 Decl.          3          Case No. 5:16-cv-02852-NC

1  NSF proposal, Dr. Abbeel has been a significant contributor to the development of the
2  application of Deep Learning techniques to the problem of reinforcement learning in robot
3  manipulation.

4      10.    There may be some incidental mention in Dr. Bradski's old emails from Willow
5  Garage and probably also in Dr. Abbeel's University of California, Berkeley emails and emails
6  of Maja Mataric (a fourth collaborator, a professor at University of Southern California).

7      11.    In about 2012, Dr. Bradski and several others spun out of Willow Garage to form
8  Industrial Perception, Inc. ("IPI"). Though invited to join this start up, I deferred as I was in the
9  midst of another robotics project for the U.S. Government that, because of its importance to the
10 war and capacity to save lives, I felt that I could not abandon. Despite this, Dr. Bradski continued
11 to offer that I could join them in some executive capacity when that project wrapped up. As it
12 happened, IPI was sold to Google in early 2013, and I never joined. By that time however, my
13 project was wrapped up and I was ready to do something new. In about 2012, we started talking
14 about forming a new company in robotics, probably in robotic perception, as IPI had been a very
15 good success in that space.

16     12.    We put that idea on hold when we were persuaded to join Magic Leap instead, the
17 augmented reality company. We were told that the objective of Magic Leap was to develop a
18 wearable, consumer electronic device that would enable users to experience the online, virtual
19 world visually on top of the real world. Instead of pursuing our robotics company full time, I
20 joined Magic Leap in the Fall of 2013. On my first trip to Ft. Lauderdale, for my interview, I was
21 shown a piece of electronics that generated a display. It was clear to me that they were first and
22 foremost a display company, and that has not changed. However, it was also clear to me that in
23 analogy to a cell phone, where it is software that creates most of the value of the system, not the
24 hardware, the Company's ultimate success would depend on the development of the software
25 that would bring their display to life. Furthermore, it was made completely clear to me that the
26 reason I was being recruited was to create this necessary software.

27     13.    But, in 2013, I specifically negotiated, as part of my employment contract, a right
28 to continue my consulting work on noncompeting projects without restrictions. I wanted to be

**Computerlaw Group LLP**
www.computerlaw.com℠

1  able to continue working with any existing as well as future projects, consulting with other

2  companies and working on new companies, as I had until that time with AMI. I had a

3  conversation about this with Rony, in person, over lunch at a lakefront restaurant in Florida. I left

4  that conversation with the impression that this was acceptable to Magic Leap, as long as these

5  outside activities did not conflict with Magic Leap's AR business, and subsequently it was

6  negotiated into my Employment Agreement in the form of my "Freedom to Consult" clause in

7  the Offer Letter. My November 2013 Employment Offer letter states that I "will be free to pursue

8  ongoing consulting work consistent with [my] past practice." Ex. A at p. 2.  The full term states:

> You will work for the Company full time.  You agree that, during the term of your employment with the Company, you will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company; ***provided, however, that you will be free to pursue ongoing consulting work consistent with your past practice***.

13 [Emphasis added].   With respect to that clause, my past consulting work included consulting for

14 a wide range of companies, in the government[4] and in industry, from startups to large,

15 established Fortune 500 companies, in the fields of computer vision and sensing, robotics,

16 robotic autonomy, and an array of other topics in computer science and engineering.  As Rony

17 and I discussed, the clause refers to having the ongoing right to continue the kind of work that I

18 had done in the previous eight years (before joining Magic Leap) as I had done while I was at

19 AMI, consulting for various entities.

### Magic Leap Work Never Involved Robotics

21          14.     In the Summer of 2015, because of a continuing personal interest both of us have

22 had and still have in the field of robotics, Dr. Bradksi and I started talking about pursuing an

23 independent project in our spare time in robotics — one that had nothing whatever to do with

---

[4] I built robots for Air Force Research Lab (AFRL) and the Joint IED Defeat Organization (JIEDDO). The latter was the 3-star command specifically set up for the purpose of finding solutions to enemy IED attacks in Iraq and Afghanistan — from 2008–2011, the number one source of fatalities for US servicemen and women in those theatres. My patriotism, in hind sight, cost me a fifth share of the IPI exit when I passed on Dr. Bradski's invitation to join when IPI spun off from Willow Garage.  That was no small price, but the service persons we were trying to save were paying a greater price still.

**Computerlaw Group LLP**
www.computerlaw.com[sm]

1 anything we (or anyone else to our knowledge) was working on at Magic Leap. We felt so
2 confident that there was not a problem, that we fully disclosed the project idea to Scott Hassan,
3 who was a Google founder, the founder of Willow Garage, a primary investor in IPI, and a board
4 member and substantial shareholder (we believe, in fact, the largest shareholder) in Magic Leap.

5     15. Dr. Bradski and I clearly related our feeling that we had been successful in
6 helping Magic Leap raise the necessary funds for its future success as an augmented reality
7 company, and that we felt it was time for us to return to our original objective. It was always my
8 understanding that this was the precise reason Dr. Bradski and I were asked to join Magic Leap
9 in the first place: to seed and develop a credible software organization that would both
10 successfully attract critical investors as well as lay the foundation for the continuing success of
11 the Company after funding had been secured. Scott stated that he shared our feeling that our
12 contributions to Magic Leap had been a success. He showed no indication of any conflict with
13 what Magic Leap was doing. At no time did Scott ever suggest that there was even the potential
14 for conflict with Magic Leap. Based on this conversation, it was clear to me he understood this to
15 be a new, interesting, and distinct opportunity.

16     16. In addition to all of this, the fact that my work at Magic Leap did not in any way
17 involve robotics was made clear to me in a variety of ways. For example, even though my
18 primary work at AMI had been in robotics, and my official title was "VP of Robotics," at no time
19 did any of my robotics experience or expertise get used by Magic Leap and at no time was I
20 asked to do anything ever related to anything robotics.[5] At Magic Leap, my initial title was: "VP,
21 Technology Solutions & Member of Technical Staff, Computer Vision." In my entire 30-month
22 or so tenure at Magic Leap, I never had a single conversation with Rony or anyone else about

---

[5] In fact, the only thing remotely related to robotics that I can recall is an idea submitted for patentability review by ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ as part of a "patent clinic" I had started in my last months, along with the VP of Intellectual Property, Jeffrey Sommers. Their concept, which I looked over in my last month, used a robot ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. In fact, I even proposed a way that this patent could be implemented more simply and possibly more cheaply without a robot. This is not at all related to the idea for RAI, which aims to reinvent robotics, not simply use robots as they are typically used.

Dr. Kaehler R.12 & 56 Decl.       6        Case No. 5:16-cv-02852-NC

1  any type of actual robotics project at Magic Leap. For that reason, I find the recent expressions in
2  their legal pleadings and in the public relations statements they have put out suggesting this as
3  simply false, fraudulent, and entirely deceptive. It is simply untrue.

### OCTOBER 2014 UNTIL THE WRONGFUL TERMINATION

5      17.    After the Series B round was funded in October 2014, Rony called me out to
6  Florida for a one-on-one meeting. In this meeting he asked me to move to Florida. His words
7  were closer to "so, when are you moving to Florida?" I was not inclined to move, for a variety of
8  reasons (some obvious, others personal), but I also truly felt that being in Florida was not right
9  for the Company. I responded by saying that I did not feel that it was correct for me to move,
10 explained what I believe to be good reasons, and continued that I thought that Rony might want
11 to think about those reasons himself. I actually tried to encourage him to either move out to
12 Silicon Valley, or to at least have an office here, and spend much more time here, both to
13 strengthen morale and build the talent pool, as well as to encourage our Silicon Valley team and
14 investors.

15     18.    The conversation between Rony Abovitz and me turned to what I would be doing
16 "post B round." Rony wanted a big software organization, and it was clear that he wanted
17 someone in Florida to run it and I was not moving to Florida. Thus, for me, the writing was on
18 the wall that either I would have to convince him to change his mind about Florida, and/or
19 change his mind about where software development would be centered for the Company. I was
20 unable to do either; however, he indicated that we had "plenty of money" and that I could "write
21 my own ticket," and asked me what I wanted to do. I pitched to him another idea I had that I
22 thought had high value to the company, to which he indicated a strong interest.[6] The project was
23 to ███████████████████████████████████████████████████████████████
24 ███████████████████████████████████████████████████████████████. As a

---

[6] I did not pitch robotics to Rony. This was not because I was "withholding my ideas," but because it really genuinely never crossed my mind that building robots was in any way related to of Magic Leap's business goals. I should further add that I was present for many investor presentations and tours and the like for various high net worth individuals and representatives of wealthy organizations, including some who would later become our future investors. I do not recall anyone every telling any of them that if they funded us, we were planning to spend some of their money on building robots.

Dr. Kaehler R.12 & 56 Decl.                            7                            Case No. 5:16-cv-02852-NC

result, in the Fall of 2014, he promoted me to Vice President of Special Projects and put me in charge of this effort.

19. The truth is that regardless of various promises and representations, the Company never funded any special projects for me to undertake and my job became one limited to helping with the writing of a number of patent applications. Not a single one of those patent applications had anything whatsoever to do with machine learning in robotics, or any novel control of existing robots, or any non-novel control of novel robots, nor did I ever hear of anyone else at Magic Leap working on any patent application in these areas of machine learning in robotic, novel control of existing robots, or non-novel control of novel robots.

20. The dinner with Rony in Florida in Fall of 2014 happened, to the best of my recollection, in late October 2014, at the vegetarian restaurant Sublime. I had a lengthy trip scheduled to Japan throughout the month of November, which was a "working vacation," meaning that I was working four hours a day and logging all days as half days of vacation. I spent this time in deep study of a potential project for Magic Leap that again had nothing to do with robotics. By my accounting, I was logging four hours of paid-time-off per day and working at least four hours for Magic Leap per day. I devoted over half my vacation time to work for Magic Leap. When I was not on vacation, I was working at least eight hours per day on non-PTO days for Magic Leap.

21. I continued this work after returning from Japan. Until July 2015, all of this work was done in detailed physical notebooks, whose dated entries not only catalog work, but also show the breakdown of that work at relatively high temporal resolution. Those notebooks were delivered to my attorneys at Computerlaw Group for safe-keeping and for return to Magic Leap as soon as I received the termination letter. At no time have they done any type of orderly exit interview of me. Any notes I kept electronically are on my personal computer, which has also been delivered to my attorneys for safe-keeping, segregation, and return of this data to Magic Leap. I kept the notebook used for Magic Leap's most confidential information in a cipher for Magic Leap's protection to preclude "casual" perusal by strangers of the document either while I was writing in it, or if someone should happen to have momentary access to it for some reason.

22. So, in summary, in the last 18 months for Magic Leap, I have worked full-time on the following:

(a) Researched, defined, and launched "▮▮▮▮▮▮," a long range strategy to create a profitability for the company which I believe to be no less than an order of magnitude greater than any of its existing strategies could deliver;

(b) Built a beyond-state-of-the-art ▮▮▮▮▮▮ system, leading a team of engineers to do so;

(c) Invented, designed, and built, with the same team, a novel ▮▮▮▮▮▮ system using emerging technology from my fields of expertise;

(d) Authored approximately sixty (60) patents, now in various states of filing, pertaining to a broad array of topics including ▮▮▮▮▮▮; and

(e) Began the formation of a patent review board and process for Mountain View engineers.

23. It goes without saying that beyond all the "vacation time" that actually was work time, during the many work days in this time when I was working in the office, often late into the evening, there was *never* any complaint about the quantity or quality of my work. Indeed, in March 2016, I received a bonus and a congratulatory letter signed by Rony as CEO making clear that my work ethic, deliverables, and overall contributions were applauded by all. A true and correct copy of his letter is attached as **Exhibit D**. What is not recognized therein (or anywhere) is just how many additional hours I spent in "worker therapy" with so many employees who expressed deep dissatisfactions with the "us v. them" mentality that existed in the way the Florida executives tried to absentee manage the California talent. From my familiarity with the spectrum of engineering work being done in the Company, the majority of the best work was being done on the West Coast. It seemed to me and was expressed to me by many employees in various language that the East Coast operation existed for the pleasure of senior people who preferred to live in that tax-free state, and who were not about to join us in California except through occasional visits.

## THE WRONGFUL TERMINATION

24. I believe I was effectively constructively discharged earlier this year when I was told that there was no budget for any project to be led by me in 2016. I had spent over a year working on patents and working on the ideas for an ▮▮▮▮▮ project. Everything that I developed on the ▮▮▮ project was turned over to others at Magic Leap and I was literally left only with helping document various patent applications, and perhaps conceive new ones, which I did diligently, but it was not the basis upon which I was asked to join Magic Leap, nor the basis on which I accepted employment, nor the basis on which I chose to continue at Magic Leap after October 2014. I am a scientist, inventor, and innovator, and I found what Rony and others did an intentional effort to secure my resignation. Indeed, I tried to negotiate a fair exit that would allow me to continue to vest my shares and also provide needed transition help on the pending patent application work, but even this was rejected by Magic Leap in favor of the pretextual retaliatory termination of my employment.

25. I say that my employment termination was retaliatory and was wrongful because it was done in response to my raising directly with management at Magic Leap the scope of the "right to consult" which is in my agreement with Magic Leap. I had authorized my legal counsel, Michael Krieger, Esq., years ago to make sure that provision was included in my agreement, and he secured that clause for me to assure that I could work in parallel on other non-conflicting projects. As set forth in the foregoing, at no time was the robotics idea that Gary and I had been discussing ever viewed as conflicting by anyone.

26. In 2016, I had my legal counsel, Jack Russo, attempt to get in writing some added clarifications regarding that clause, but every email question that Mr. Russo posed to Attorney Mark Albert, General Counsel for Magic Leap, was ignored or rejected by him. Ultimately, because Mr. Albert wrote Mr. Russo to say in substance that "a Court would have to decide the meaning," Mr. Russo suggested and I agreed to authorize the filing of a declaratory relief lawsuit seeking an early expedited resolution. Following that civil filing, Magic Leap filed a bogus lawsuit against me (and against Dr. Bradski) in federal court for alleged trade secret misappropriation.

27. I say with conviction that Magic Leap's retaliatory federal suit is bogus and a sham for three reasons: first, categorically, there were and are no trade secrets in the area of robotics at Magic Leap, and thus neither I nor Dr. Bradski could have misappropriated anything. Second, we had, have had, and continue to have pre-existing ideas about robotics based on our collective over 40 years of experience and expertise in the field before joining Magic Leap, and nothing at Magic Leap has informed or aided any of our pre-existing thoughts in these areas, nor (as explained above) could they. Third, neither Gary Bradski nor myself has written a line of code, generated a shred of intellectual property or done anything to ever actualize any type of invention or innovation for Robotics Actual — we have merely brainstormed about the definition of the problem based on pre-existing information, and created a slide deck which outlines the many challenges which had to be undertaken. Fourth, at no time have I ever transferred or disclosed any Magic Leap confidential information to OpenCV.ai, Robotics Actual, Ethan Rublee, Pieter Abbeel, Kleiner Perkins, or any other third party. Fifth, at no time have I ever solicited a Magic Leap employee to join Robotics Actual or any competing venture to Magic Leap. Sixth, I have not made any false statements about Magic Leap's to investors or third parties, including anyone at Kleiner Perkins.

28. My understanding is that Dr. Bradski discussed our robotics ideas for the new company with Rony, yet to my knowledge, the results of that discussion did not produce a single historical budget or single email authorizing any type of resource expenditure by Magic Leap on anything in this area. I understood that Rony had not made any claim of perceived ownership of our robotics ideas by the Company. Any and every contrary assertion by Magic Leap is merely fabricated now in order to support what I firmly believe is a sham litigation filed to try to justify the wrongful termination and the wrongful forfeiture of vested stock rights I own, and which I sent the Company a letter and check to exercise, but which Magic Leap's corporate lawyers have ignored.

29. I discussed my transition plan with Laura Langehaug, the VP of Human Resources at Magic Leap in April and May 2016, with Henk Vlietstra (her and my boss), In each of these, I made clear that it was my intention to work in robotics and in a manner non-

1  competitive with Magic Leap. I also wrote an email directly to Rony on April 5, 2016, in which I
2  clearly explained I wished to do non-competing work and would sign a non-competition
3  agreement with the Company.  **Exhibit E** is a true and correct copy of my email to Rony from
4  April 5, 2016, along with subsequent related messages through April 18, 2016.  I was told I could
5  take my accrued paid time off, and the company sent draft separation paperwork.

## DEEP REINFORCEMENT LEARNING IS AN AREA OF PUBLISHED RESEARCH AND STUDY OUTSIDE MAGIC LEAP AND NOT IN USE AT MAGIC LEAP

8  30.    Deep Reinforcement Learning is an area of advanced study in machine
9  learning/neural networks.  "Machine learning" is a term from this field that came into use in the
10 1990s, which refers to using artificial intelligence ("AI") techniques to solve real-world
11 problems that can generate revenue.  It could be described as "applied AI."  "Neural networks"
12 as an application of machine learning go back very early, to the birth of computing, and the term
13 refers to any construct based on the "perceptron" learning model.  "Perceptron" is a simplified
14 model of how human or animal neurons work, that practitioners use to study and design artificial
15 neural networks that work like organic (human or animal) networks.

### 1990s–2012:  Neural Networks

17 31.    In about the 1990s, the study and use of "neural networks" was in a dark age: the
18 number of papers published in neural networks from 1990–2012 was relatively few.  Though
19 Geoff Hinton, University of Montreal, (and others) had proposed the "backpropagation"
20 algorithm, which would turn out to be the fundamental tool that makes practical neural networks
21 work, the necessary computing power simply did not yet exist to support the application of this
22 algorithm on the necessary scale. Basically, like many networks of biological neurons, a neural
23 network has a topology of many layers each contributing their output to another, from one layer
24 to the next.  To train your network, you feed data, inputs, into your model, and observe whether
25 the output is right or wrong.

26 32.    For example, one could model a network that could analyze pictures of jets in
27 flight to identify whether it is a "friendly" or other.  If one showed a picture to such a network,
28 and output is correct in identifying the jet, one would want to keep that network. If wrong, one

*Computerlaw Group LLP*
www.computerlaw.com<sup>sm</sup>

1  would want to be able modify my network so the next time it sees a picture, it is more right.  A
2  key question is, when you are dealing with many layers, each generating its own output feeding
3  other layers in a deep hierarchy, how does one perform the necessary adjustment to improve the
4  network where it was wrong, but not damage it where it was right.  One needs to be able to
5  assign the "blame" for the "wrong" output of my network down to the individual "neurons" in
6  the layers that fed into the model. That is the function of the back propagation algorithm that
7  Geoff Hinton is broadly credited with having discovered.

8   33.   Other luminaries who did critical work during this period include Yann LeCun at
9  NYU and Andrew Ng, at Stanford, the latter having invented a critical technique around 2012 for
10 how to use graphic processors to solve this particular problem, which was a beneficial advance
11 because graphic processor are tens of times more efficient than CPUs.

## 2012: ALEX NET and Deep Learning

13   34.   What we now call "Deep Learning" came into being in about 2012 with an
14 advance called now known broadly as AlexNet.  Alex Krizhevsky, a student of Geoff Hinton,
15 published a paper summary of his Ph.D. thesis in 2012, revealing AlexNet as the first shockingly
16 capable deep neural network, a radical improvement on any prior result on the ImageNet
17 classification program, a well-known problem in the computer vision community.

18   35.   The "Deep Learning" era was made possible through "huge compute," a
19 combination of vast GPU processing power and enormous data sets that could only be produced
20 from "web scale" data. These giant data sets, along with new algorithms for training and
21 innovations like the restricted linear unit (RELUs) made AlexNet and the subsequent field of
22 Deep Learning possible. The back propagation algorithm Geoff Hinton discovered[7] was a very
23 complex algorithm to implement in practice even though mathematically simple.  Prior to the
24 availability of big compute and big data, it was not possible to train networks that were very
25 complicated.  There were several reasons why it was difficult: these networks are very
26 computing intensive; need a lot of data, vast libraries of images, such as Google Images keeps, as
27 actual examples to train the networks. Previously, trainable networks might only have two or

---

[7] This algorithm had been discovered and rediscovered many times.

Dr. Kaehler R.12 & 56 Decl.                    13                    Case No. 5:16-cv-02852-NC

1  three layers or a few hundred neurons. AlexNet advanced that to about seven layers and many
2  hundreds of thousands of neurons. Now, there are Deep Learning networks have tens to a
3  hundred layers, and millions or billions of neurons. This is a hugely different scale, with
4  exponentially greater power. There are algorithms and network topologies of many millions of
5  layers that are capable of classifying millions of images into 1,000s of categories with reliability.

### Deep Network Libraries Are Publicly Available and Licensable Tools

36. It makes no sense for Magic Leap to claim "Deep Learning" as its proprietary exclusive technology being developed at Magic Leap, and it makes no sense for Magic Leap to claim it can exclude others from using "deep network libraries" as its exclusive property.

37. For most developers, Deep Learning is a technique in computer programming that they use a tool, like one would use a hammer in construction, that can be used to "build" technology in many, many applications. Another analogy from within the area of computer science itself is a compiler. Compilers are themselves computer programs, but most people use them as a tool to write source code, converting their human readable source code into machine executable object code. Just as there are some people who actually study and write the code that functions as compilers, there are people who write Deep Learning algorithms, which other computer scientists use as a tool for working with their own "deep neural networks" modeled and populated with data. One develops models and collects data (**or analogously writes code**) and trains it using the libraries (**analogously compiles it**) to produce a trained network (**analogously executable application**) which are the real things of value.[8]

---

[8] Another analogy to think about the difference between those who study and advance the technology of Deep Learning (or study and develop compilers) is the difference between the general population of people who know how to use hammers, and those who actually know how to make a hammer. Deep Learning is a tool that any developers can learn to use. It takes many more years of dedicated study (typically, such persons have Ph.D.'s for work in precisely this field) to become a person inventing and advancing the technology that goes into the Deep Learning tools. The companies that have divisions dedicated to this are, e.g., X (founded as GoogleX, now a subsidiary of Alphabet). Magic Leap does not have such a division. It has a Deep Learning group that Gary was building, including hiring its now leader, Andrew Rabinovich to bring the Deep Learning tools to Magic Leap's work developing software for its AR headsets. **Exhibit G** is a true and correct copy of the LinkedIn page listing Mr. Rabinovich as "Director, Deep Learning, Magic Leap, April 2016 to the present, Deep Learning for

38. The most important of these Deep Learning toolkits is called TensorFlow, https://www.tensorflow.org/, which is an open source tool by Google. Others are Caffe (written at Berkeley, whose author went on to write Tensor Flow at Google, and Torch (written by Yann LeCun's team). TensorFlow, backed by Google, appears to be bigger and better funded than Caffe and Torch. Those three are the most important at this moment. Reaching back into the toolbox analogy, if "Deep Learning" is a hammer, then TensorFlow might be a claw-hammer, Caffe is a framing hammer, Torch is a lineman's hammer, etc. The point is that any one of those "hammers" can be used for any job, some are just slightly better suited.

39. Just as Magic Leap is not in the business of writing compiler code, it was not in the business of inventing "Deep Learning" or building "deep network libraries." Deep Learning was not being developed at Magic Leap, it was using those tools. Gary was instrumental in making sure that Magic Leap did not miss out on the potential for using Deep Learning tools in its AR headsets field of use, but he was running a barracks not a sword factory. If we at Magic Leap had ever developed a novel Deep Learning technology itself, one might say "you improved Deep Learning itself and now Gary and Adrian cannot take that improvement to use at their new company;" but that is not the case. That is not what Magic Leap did. Just as Magic Leap did not build robots or write compiler codes— it bought robots and used them as a consumer, it used available compilers to convert its AR source code into object code—the same went with Deep Learning. It used the Deep Learning tools that are available to everyone, and whatever deep neural networks it was building are in no way the only approach to building a deep neural network such that it could stop every other company from building its own. Deep neural networks can be as different one from another as say accounting software is from software game code. We do not really know yet how to do as diverse an array of things with deep neural nets as we do with compilers, but this is broadening very fast.

40. **Exhibit F** is a summary of approximately 2,000 publicly available papers (as of June 6, 2016) on arXiv.org, the largest electronic pre-print archive for machine learning and

---

Perception and Interaction in Augmented Reality," formerly principle engineer. https://www.linkedin.com/in/andrew-rabinovich-28556014)

related papers. I did a search for every paper containing the list below of key phrases and assembled the results into the attached spreadsheet.

```
search_keys = [
   'deep neural',
   'deep reinforcement',
   'deep learning',
   'deep network',
   'convolutional neural',
   'backprop',
   'cnn',
   'dnn',
]
```

41. Moreover, deep neural networks are evolving very fast — benchmarks fall to the next technique or model every single competition. What is used today will be replaced by a new model next year almost certainly. Magic Leap's best models today almost certainly will be quite modified or replaced and trained on wholly different data by product ship date or beyond.

### **Magic Leap Does Not Use Deep Reinforcement Learning**

42. Inside of Deep Learning there are many sub categories. "Deep Reinforcement Learning" is a subcategory of Deep Learning, that emerged as a topic in the field, rather than as a somewhat obscure parallel pursuit, around 2014 with a paper from a company called Deep Mind, the "Atari Deep Reinforcement Learning paper." That company (later acquired by Google), showed in the paper it was able to train an algorithm to play 80s era arcade games such as Atari's Space Invaders. Deep Mind did not invent the problem, since "video game emulators" or simulators had been written for testing video games, for about 20 years, but it did astonish everyone by applying Deep Reinforcement Learning successfully to the video game emulator problem.

43. Deep Learning tends to focus on classification in some way; *e.g.*, a computer capable of low-level semantic categorization is shown images of cats and dogs, and is able to

recognize "cat" not "dog." Higher level categorizations are also important and not impossible, and are in use for speech recognition and search as well. In Deep Reinforcement Learning, that is not the case; what is being learned is not a description or "classifier," but what is called a "policy." A "policy" is what one should do in any given set of circumstances. For example, if my computer model plays a chess game and loses, I would like to be able to train it to learn to play chess better based on that "experience." Policy learning and reinforcement learning are pretty much synonymous. Reinforcement/policy learning existed before deep neural networks or Deep Learning, but provide a new way to approach that problem, "Deep Reinforcement Learning": As discussed above, Deep Learning relies upon "value assignment," with algorithms that assign the "blame" for a wrong output of the entire network down to the neurons that fed into it through back propagation algorithms. Deep neural networks provide a new way to approach the problem of how a computer learns to perform in a policy context rather than a classification context.

44. No one in Magic Leap while I was there was working on Deep Reinforcement Learning for any purpose whatever. Neither was I. It exists, to my knowledge, right now only outside of Magic Leap, e.g., at U.C. Berkeley and at Deep Mind, and perhaps a few other academic and research institutions. The possibilities of Deep Reinforcement Learning are not lost on industry: Tesla, as well as other autonomous driving groups, are all trying to learn and apply Deep Reinforcement Learning. Most people who know this area are students who have not graduated yet.

45. This only makes sense. While deep reinforcement is useful to control things like a robot arm, it is not an obvious or efficient choice of tools for AR/VR.

46. In summary, I am comfortable saying under oath that I fully believed then and now that my California law rights and contractual "consulting freedom" clause gave me the right to work on the robotics ideas with Gary Bradski that we called "Robotics Actual", and that I never spent less than eight hours working for Magic Leap on any given day and often I worked far longer hours and never on anything that caused me to think there was any type of ethical conflict with anything that I was doing independently. I firmly believe that the pretextual suit is

entirely motivated by the bad faith decision to obtain a forfeiture of stock rights that are conservatively valued at over $■■■■■■.

47.  I ask the Court to dismiss the federal lawsuit because it lacks any factual basis, it is entirely unnecessary, and because even before any filing had occurred, I had as a matter of precaution delivered all my electronically stored information ("ESI") and notebooks in my possession to an escrow being held securely at the offices of Jack Russo and Computerlaw Group in Palo Alto, California. There was and is simply no misappropriation of anything, no conversion of anything, and no threat of anything. The lawsuit is unnecessary and merely exists, in my opinion, as a pretext to justify a very wrongful termination and a very wrongful refusal to honor my stock rights.

I declare, under penalty of perjury, that the foregoing is true and correct and that this declaration was executed on July 20, 2016 in Palo Alto, California.

                                                        /s/ Adrian Kaehler
                                                        Adrian Kaehler

Under Civil Local Rule 5-1(i)(3), I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the signatories indicated by a conformed signature (/s/) within this e-filed document.

                                                        /s/ Christopher Sargent
                                                        Christopher Sargent