Pages 1 - 18, 28 - 37

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE NATHANAEL COUSINS, MAGISTRATE JUDGE


| | |
|---|---|
| MAGIC LEAP, INC., a<br>Delaware corporation,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>ADRIAN KAEHLER, an<br>individual, and ROBOTICS<br>ACTUAL, INC., a Delaware<br>corporation,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)　NOS. 5:16-cv-02852-NC<br>)<br>)<br>)<br>)<br>)<br>)<br>)　San Jose, California<br>)　Friday, June 9, 2017 |

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING**
**OF PROCEEDINGS** - **NON-SEALED PORTION**

FTR 11:09 a.m. - 11:31 a.m and
11:43 a.m. to  11:57 a.m.=  36 minutes


**APPEARANCES**:

For Plaintiff:　　　　Kramer Levin Naftalis & Frankel LLP
　　　　　　　　　　　990 Marsh Road
　　　　　　　　　　　Menlo Park, California  94025
　　　　　　　BY:  **LISA KOBIALKA, ESQ.**
　　　　　　　　　　**KRISTOPHER V. KASTENS, ESQ.**

For Defendants:　　　ComputerLaw Group, LLP
　　　　　　　　　　　401 Florence Street
　　　　　　　　　　　Palo Alto, California  94301
　　　　　　　BY:  **JACK RUSSO, ESQ.**　(by telephone)
　　　　　　　　　　**LUCY GOODNOUGH, ESQ.**


Transcribed by:　　　Leo T. Mankiewicz, Transcriber
　　　　　　　　　　　leomank@gmail.com
　　　　　　　　　　　(415) 722-7045

<u>Friday, June 9, 2017</u>

                                                    <u>11:09 a.m.</u>

                    P R O C E E D I N G S

        **THE CLERK:**  Calling civil 16-2852, Magic Leap,
Incorporated, versus Bradski, et al.  Counsel, please state
your appearances for the record.

        **MS. GOODNOUGH:**  Good morning, your Honor.  Lucy
Goodnough for defendants.

        **THE COURT:**  Good morning.

        **MS. KOBIALKA:**  Good morning, your Honor.  Lisa
Kobialka, and I'm here with my colleague Kris Kastens.

        **MR. KASTENS:**  Good morning.

        **MS. KOBIALKA:**  On behalf of Magic Leap.

        **THE COURT:**  Good morning, and I believe we have
counsel --

        **MR. RUSSO:**  Good morning, your Honor.

        **THE COURT:**  Go ahead, Mr. Russo.

        **MR. RUSSO:**  Good morning, your Honor.  Jack Russo,
by Court Call.

        **THE COURT:**  Good morning.

        And is there anyone else on the phone, or is it only
Mr. Russo?

        **THE CLERK:**  Only Mr. Russo, your Honor.

        **THE COURT:**  All right.  Good morning, all.  We will
speak into the microphone so that Mr. Russo can hear us, and

1    also so that we can make a good record of today's proceedings.

2    Any party may request a transcript from the recording.

3         We're here on the defendants' Kaehler and Robotics

4    Actual motion to dismiss Robotics Actual, and motion to strike

5    the plaintiff's amended trade secret disclosures.

6         I know you've been in settlement discussions.

7    I know you've had litigation arising from those settlement

8    discussions.  I know that that is happening.  I don't know the

9    details, and I'm not delving into that topic today.

10        We also have a hearing set for next week in other

11   matters.  So today is focused on the trade secret disclosures

12   part of the case.

13        As to the motion to dismiss Robotics Actual, that

14   motion is denied.  It's relying upon factual matters that are

15   not in the pleadings, and it's really just a request and a case

16   management type of suggestion that it would be helpful to

17   dismiss Robotics Actual, but that's not a basis on a Rule 12 to

18   dismiss a party from a case, so it's denied.

19        If there is a motion for summary judgment later in

20   the case that there's not a basis for a claim against Robotics

21   Actual, that would be the appropriate time to take up the

22   defense and the request to dismiss Robotics Actual, or of

23   course, through a stipulation and dismissal at a later time,

24   but for the reasons given in Magic Leap's opposition, which

25   opposes the request to dismiss Robotics Actual, and even from a

case management perspective, if we just looked at it that way,

not as a motion, there are good reasons to keep them in the

case from a discovery perspective.  They are a party, and if

I dismiss them, they would no longer be a party, and that might

make the discovery more challenging.  So for those reasons, the

motion to dismiss is denied.

I have a logistical -- two logistical things to say

next as to the motion to strike the trade secret claims.  One,

I am in a jury trial down the hall, so at any moment I may need

to go back there, and so if I exit suddenly, it's not because

there's an earthquake or some emergency, it's because there's

eight jurors and a number of attorneys and parties down the

hall anxiously awaiting the results of our trial.

But secondly, I want to make sure that I have the

current version of the amended disclosure of trade secrets, and

I say that for two reasons.  One, I've received many documents

under seal, and I'm going to grant the request to seal, but

I want to make sure I don't make a mistake looking at the --

not most current version of it in ruling on the motion.

So if I may ask Magic Leap to put into my hands,

preferably -- thank you -- the most current version, because

there were several different amended versions.  Thank you, and

it's marked as Exhibit 3.  That's the one that I -- the most

current one, but I wanted to make sure I was not relying upon

the wrong document in ruling on the motion.

1          There are --

2          **MS. KOBIALKA:**  Your Honor?

3          **THE COURT:**  Yes.

4          **MS. KOBIALKA:**  If I may, we would like to seal --

5    close the courtroom -- there seem to be some individuals I'm

6    not familiar with -- to the extent we're going to delve into

7    details.

8          **THE COURT:**  Thank you for the request.  The two

9    people on this side are my externs, and if we do seal the

10   courtroom, they can remain.  The woman on this side I am not

11   familiar with, and this hearing so far has been a public

12   hearing, and there's a presumption of public access to our

13   discussions.

14          I will take up in a moment your request, and I'm not

15   going to comment on what's in here until we take up that issue,

16   and this is the version which I've previously seen and has been

17   submitted under seal and I will continue it to be under seal.

18          As to the request to seal the courtroom and to seal

19   the record in discussing the trade secret disclosures, it may

20   be that there are some portions of the discussion that could be

21   had publicly without delving into the details of the trade

22   secrets, and I, of course, want to get the defense view as to

23   any confidentiality designations and how to address the issue,

24   but my instinct would be to first discuss the motion at the

25   high level without going into any details, and then, I think as

1    will likely be appropriate, to discuss the details of the trade

2    secret disclosures and the trade secrets.  That part might be

3    confidential and under seal.

4        Ms. Goodnough, what is your view as to the process

5    of discussing the trade secret disclosures?

6        **MS. GOODNOUGH:**  Well, your Honor, I've been closely

7    following the opinions that are coming out of this district

8    regarding over-designations, blanket designations, of material

9    that's discussed in trade secret cases, and the cautions that,

10   for instance, Judge Corley and Judge Alsup give to the parties

11   in those cases to really consider what they are asking to be

12   sealed and asking to be removed from the public's oversight,

13   and I think that it's -- we tried in this case to make that

14   effort and meet and confer on administrative motions, and

15   under -- and designations under the stipulated protective order

16   to follow those guiding principles, and we're really concerned

17   that the designations are not consistent with that.

18       And there's a second point on that.  There's been a

19   waiver by Magic Leap of the blanket designation as to the AEO

20   amended disclosure.  We challenged the designation under

21   section 6.2 of the stipulated protective order.  Under section

22   6.3, they had until last Friday to make the motion to preserve

23   the designation, and under the order, it's been de-designated.

24       **THE COURT:**  As to which filing are you referring?

25       **MS. GOODNOUGH:**  The amended disclosure.  There was

1    no -- there was no motion filed.

2              **MS. KOBIALKA:**  Your Honor, if I may, that must be an

3    oversight, then, on our part.  We would like leave -- and maybe

4    on this calendaring issue, that was inadvertent.  This is the

5    first that I've heard that there was a waiver and I'd like to

6    be able to address that for the motion practice, because

7    obviously, the disclosure, in and of itself, the full

8    disclosure, not only does it contain some of Dr. Kaehler's

9    information he's designated as confidential, it also has Magic

10   Leap's information, and we've tried to designate that

11   accordingly.

12             We are happy to work with counsel in terms of just

13   designating certain portions of the briefs, and I think we've

14   been doing that consistently, you know, throughout this case

15   thus far.  There's been a lot of motion practice, and we've

16   tried to be selective about what we're filing under seal.

17             My only concern is in order to have a hearing,

18   sometimes you end up discussing things, and you may not be

19   aware, and so we're happy to go back and de-designate sections

20   after, you know, if we're getting into the details of the trade

21   secret disclosures.

22             **THE COURT:**  All right.  Here's how I'm going to

23   address this for now.  We have limited time.  I don't want to

24   spend our limited time focusing on either a waiver argument

25   where I'm going to give Magic Leap a chance to respond to that,

1    or to the line items of confidentiality designations.  I will

2    rule on the motions to seal, and I'll give a chance in writing

3    for the parties to address any argument about waiver, but for

4    today's hearing, I'm going to treat what's marked Exhibit 3,

5    the trade secret disclosures, the amended disclosures, as being

6    confidential, and when we discuss the details of what's in

7    there, that portion of the proceedings will be sealed.

8         If it turns out that there has been a waiver and

9    that we should do something about it later, that will be a

10   decision I'll make on a later today, not today.

11        But I do appreciate, and I have been following Judge

12   Corley's and Judge Alsup's rulings in the *Waymo* case and other

13   cases about trade secrets and how they might be used in

14   litigation, and so I'm sensitive to that.

15        So that's why I think we can have first a short

16   discussion about the law -- because the law is not

17   confidential -- on a motion to strike a trade secret

18   disclosure, but then in going to the details of what's in the

19   reports, that part, I think, should be confidential.

20        So that's my approach.  And it may be that you don't

21   have much more on the law to tell me than what's already in

22   your briefs, and if that's the case, we can skip past that

23   stage, but let me give each party a chance to give me the big

24   picture on the law before we get into the details of the

25   particular disclosures.

1          Ms. Goodnough, I'll have you go first.

2          **MS. GOODNOUGH:**  Thank you, your Honor.  I have about

3     five points that I'd like to address, and I don't think they're

4     duplicative of the briefing, but I'll try and monitor that.

5          The question in this case is whether Magic Leap

6     should comply with the more exacting level of particularity

7     required under California law, such as *Perlan* or *Advance*

8     *Modular Sputtering*, describing how its alleged secrets differ

9     from the publicly available knowledge where there are prior art

10    or matters within the general knowledge of persons in the

11    industry, and we believe that given the nature of the case,

12    where there are multiple highly specialized technical fields,

13    the nature of the claim where they're asking for injunctive

14    relief that is going to have to be framed to -- in a way that

15    can be understood and followed, should we get that far, and

16    that the case law is clear that Magic Leap's disclosure must

17    contain a high level of detail.

18          But my second point is whether or not the Court

19    accepts that the higher level of particularity from *Advance*

20    *Modular* or *Perlan* or *Loop AI* applies or whether the *Brescia*

21    standard would apply, which would be a more succinct and

22    transparent identification, Magic Leap has done neither.

23          So what is in front of the Court is not reasonably

24    particular under either standard.  We have an introduction that

25    has four pages of hedging, surplusage, legal objections,

1    reservations of rights, allegations.  Those have been routinely

2    stricken and considered by the Court as not complying -- not

3    reasonably particular.

4             On the third point, Magic Leap's assertion that now

5    is not the time for it to have to make such a reasonably

6    particular designation, I think the case law is pretty clear

7    that this happens early in the case, that it happens to the

8    best of Magic Leap's ability, and to prevent fishing

9    expeditions, to help Dr. Kaehler to understand the nature of

10   what he's being accused of having exfiltrated and develop his

11   defenses without having to go and do what we had to do in this

12   whole exercise, which is a broad search of all the prior art

13   and submit it to help the Court understand the technology, and

14   to help the Court understand what is generally known to persons

15   in the industry, that's really the job of the disclosure.

16            And we've had to do that work here, and when we did

17   that work, we did not see -- we did not see the contours of the

18   trade secret that would govern our discovery into what they

19   have when we started asking third parties for documents, what

20   we can ask for and what is overstepping the bounds, when we

21   start asking for additional depositions or additional times

22   with witnesses, the Court can review transcripts and documents

23   and see whether the secret -- there has been fair, just and

24   rational discovery into the secret as defined.

25            The fourth matter is about the challenge to the

1    Kaehler declaration.  This is segued right from my third point.

2    In the *Hakim* case that they cite as dismissing a declaration as

3    self-serving or biased, there was a third issue there.  The

4    Court was concerned with whether or not the declaration was

5    helpful to understanding the technology and the state of the

6    knowledge in the field.  We believe Dr. Kaehler has complied

7    with all the *Daubert* rules, making his education, skills,

8    experience available to the Court.  He's shown his work on the

9    prior art and provided it to both Magic Leap and the Court.

10            The Court may take his declaration with a grain of

11   salt because he is a party to this case, but it --

12            **THE COURT:**  That -- sorry -- that would go to the

13   weight of his testimony rather than to its admissibility under

14   *Daubert*.

15            **MS. GOODNOUGH:**  Correct, your Honor.  And Magic Leap

16   also had another objection that Dr. Kaehler was complaining

17   about his own invention not being patentable, he can't be heard

18   to do so.  Well, that's just not the case.  All of the

19   documents -- and I'm going to say date information by year, if

20   that's okay with Magic Leap, on the public record, or...?

21            **THE COURT:**  I don't think you need to.

22            **MS. GOODNOUGH:**  -- is they're years out of date, and

23   the rule is first to file, and we do know from at least one of

24   the claimed trade secrets, Dr. Kaehler was able to shoot down

25   his own patent.  So I really don't think that argument is --

1    defeats the credibility of Dr. Kaehler's declaration.

2        Now, as compared to the Pellet declaration, I think

3    it's pretty clear that it's not credible.  It just supplies a

4    list of categories, of labels, and then conclusorily states

5    this is reasonably particular, this is not generally known in

6    the field.  For instance, the court in *Perlan* dismissed such a

7    declaration out of hand.

8        The next point I want to talk about is the

9    proportionality and burden analysis under Rule 26, that Magic

10   Leap believes it should be able to take further and more

11   discovery from presumably Dr. Kaehler, so it can identify what

12   it claims to be its own information.

13       This is their technology, this is their information,

14   and if they don't know what the technology is, they shouldn't

15   be able to bring a claim that someone took it from them, and

16   Judge Ryu dismissed this very argument as irrelevant.  It's the

17   plaintiff, the owner, who is responsible for identifying its

18   trade secret, making it understandable to the Court, and

19   Dr. Kaehler.

20       My final point, they make a reference to their

21   federal Defense of Trade Secrets Act as somehow making this

22   whole issue moot.  I think that argument itself is a MacGuffin,

23   it's a nonissue --

24           **THE COURT:**  You say, a MacGuffin?

25           **MS. GOODNOUGH:**  A MacGuffin, yes.

1          **THE COURT:**  Tell me what -- elaborate on what a

2     MacGuffin is.

3          **MS. GOODNOUGH:**  There's a, like, a parable where the

4     men are on the train, a man gestures to a package up in the

5     baggage compartment.  What's that?  Oh, it's a device for

6     killing lions in Scotland.  There is no lions in Scotland.  The

7     package was called a MacGuffin, it's nothing.

8          We served --

9          **THE COURT:**  I appreciate the reference.  (Laughter.)

10         **MS. GOODNOUGH:**  I was hoping you would.  We served

11    special interrogatories to Magic Leap asking them to identify

12    their trade secrets under the federal Defense of Trade Secrets

13    Act, and what we got back was an objection that this was

14    information that was subject to the Code of Civil Procedure,

15    and their response, in fact, was that they had served this

16    document.

17         **THE COURT:**  That this is it.

18         **MS. GOODNOUGH:**  Yeah.  So they are -- they have the

19    same scope and the same boundaries.  So I don't think their

20    argument really has much traction here.

21         **THE COURT:**  All right.  Thank you very much.

22         And Ms. Kobialka, let me hear you in response,

23    again, without delving into the details of what's in the

24    Exhibit 3.

25         **MS. KOBIALKA:**  Certainly.  So the contours of

1    2019.210 is really intended to address discovery, the mechanism

2    to deal with discovery and notice for defenses, and in this

3    case, you know, they filed an answer to our claims and they've

4    asserted their various defenses.  They've been able to

5    articulate what they believe is not trade secrets, because

6    that's really what the subject matter of Dr. Kaehler's

7    declaration is, that, oh, all of this information is public.

8            And so what that demonstrates is that we actually

9    have disclosed this information, is reasonably particular

10   enough for them to understand really what the contours of

11   discovery is going to be and what the defenses are.

12           We're not required, and the law is pretty clear on

13   this, both in *the Advance Modular Sputtering* case, that, you

14   know, reasonable particularity does not mean you have to define

15   every minute detail of its claimed trade secret, and if you

16   look at the objections that they have raised in their reply

17   brief to our amended disclosure, which we took to heart what --

18   you know, the concerns that they had raised with their

19   objections, and tried to address what their concerns were

20   specifically by amending the disclosure, and everything that

21   they're saying, as well, "Well, but you didn't tell us about

22   this little element and what's over here and what's over here,"

23   and that's not what's required here.  Really, once again, this

24   is a discovery device.

25           To the extent that they think that we're going to

1   over-ask on any discovery, they haven't actually tied any of

2   our discovery, because we're actually already in discovery, to

3   these allegations that they -- you know, that somehow we're

4   overreaching or there's some undue burden as a result of what

5   we've done.

6           So we -- it's our position, and we feel that with

7   all the flowcharts and all the information that we've included

8   in these disclosures, that we have complied with 2019.210 as

9   far as the disclosures are required.

10          A lot of these arguments that are being made really

11  go to whether or not these things are public, right, whether

12  some of this information is public, and under the trade secret

13  law, we could be using known techniques, right, we can be using

14  combination with other things, and that would still be our

15  trade secret in and of itself.

16          So they -- you're starting to conflate a lot of the

17  patent law concepts with the trade secret law concepts, on

18  novelty and everything else, and that's a real problem.  This

19  was supposed to be about whether or not it was reasonably

20  particular, not whether or not these things were, in fact,

21  trade secrets.

22          And so that's really what the focus was, and they've

23  seized upon certain words and said, oh, this particular

24  concept, you know, a network, this type of network, everybody's

25  known about that, that's been around a long time, but there's a

1    lot more in the disclosures that we have provided.

2            I want to make sure I had addressed everything.   In

3    addition, we cited to unpublished, or -- a patent application,

4    as well as invention disclosures that provided some additional

5    specifics, because otherwise our disclosure would go on and on

6    in terms of what we were talking about for the trade secrets,

7    but these are things -- are what Dr. Kaehler was listed as an

8    inventor on.

9            And to be clear, Magic Leap doesn't file on

10   everything.  So some of the things, it decides, I want to

11   maintain this as trade secrets, some of these other things,

12   they have actually put in patent applications that will publish

13   at some point, and they recognize that, but there's a real

14   determination and decision that's made about those things, and

15   it's really difficult to hear that Dr. Kaehler now thinks that

16   the things he thought was novel while he was working at Magic

17   Leap somehow now don't qualify for some trade secret protection

18   when we decide not to go forward and file for it, or it's still

19   not public in and of itself.  But we've provided a very hardy

20   disclosure here.

21           As far as his declaration goes, I think I've talked

22   about really what that's about, and Mr. Pellet's declaration

23   was really addressing the fact that these are things that we

24   maintain as trade secrets.

25           So irrespective of maybe some other party is

1  utilizing one aspect of it, we certainly don't know whether or

2  not they're utilizing all of the different aspects, it's just

3  not public.  This is not the kind of information that runs

4  around publicly so people understand that, you know, we're

5  using in combination, one, two and three together as a total

6  system, et cetera.

7          So we can delve into those particular details, but

8  those were the primary highlights that I wanted to address.

9          **THE COURT:**  All right, thank you very much.  I don't

10  think I need to have any discussion of the particulars in the

11  disclosure to rule on the motion, but I want to give you each a

12  chance to tell me if you think I need to hear more.

13          Ms. Goodnough, do you feel a need to go into the

14  particulars in the disclosure in order to have me rule on the

15  motion?

16          **MS. GOODNOUGH:**  I would like to do so, to respond to

17  some points that counsel is making.

18          **THE COURT:**  All right, and Ms. Kobialka, how do you

19  feel?

20          **MS. KOBIALKA:**  We would only respond to what they

21  have to say.  There wasn't anything we thought we left out.

22          **THE COURT:**  All right.  Then I am going to

23  temporarily close the courtroom and seal this part of the

24  proceedings, and we will open the courtroom again.  Thank you

25  for your participation, and before I rule, we'll let you back

1    in.  Thank you.

2                                                      11:31 a.m.

3        (Whereupon the courtroom was sealed, and the portion of the

4    record immediately following, comprising pages 19 through 27,

5    was sealed by the Court and is contained in separate transcript

6                          so designated.)

7                          ---o0o---

1                                                                11:43 a.m.

2              (The non-sealed portion of the hearing resumed

3                    as shown below, at 11:43 a.m.)

4              **THE COURT:**  All right, this part of the proceedings

5    is public, the courtroom is open, and this portion is not under

6    seal.  I'm not going to be referencing any of the detail of the

7    information in Exhibit 3, the trade secret disclosures.

8              The issue on the motion to strike is the sufficiency

9    of the trade secret disclosures under California C.C.P.

10   2019.210, and the parties agree that the big picture words are

11   reasonable particularity, and in some way, those two words

12   don't fit well together.

13             "Reasonable" is a test of something less than

14   perfect, total, hundred percent, but it's something more than

15   just a general notion of, you know, partial particularity.

16   It's reasonable, it's at some objective middle ground, and the

17   purpose of it is to give the responding party a chance to take

18   discovery and to challenge, through a process, the trade secret

19   assertions and to respond in a meaningful way without having to

20   go on wild goose chases of searching every piece of technology

21   anywhere on entire broad subjects, and also for the party

22   disclosing the trade secrets to be able to focus on those trade

23   secrets going forward in the case without having to respond to

24   discovery about every technology subject under the sun.

25             And the second word, "particularity," of course,

1    does -- is a word requiring something more than just concepts

2    of technology, architecture of technology.  It's something more

3    than just conceptual.

4         So there's probably quite a bit of middle ground in

5    both words that, in this type of litigation, there's often

6    disputes in -- there's not a lot of experience, but some that

7    there's middle ground where parties parry back and forth about

8    whether disclosures are sufficient or not.

9         Let me dispense with a few of the foundational

10    issues raised by the parties here at the hearing, and thank you

11    for your preparation on these topics.

12         As to whether I should consider the Kaehler and

13    Pellet declarations in ruling, I am going to consider both.

14    The challenges, I find, go to the weight of their information

15    rather than to the admissibility.

16         Particularly as to Dr. Kaehler, given his expertise,

17    I find it very helpful to know what he thinks about this, and

18    to have his review of the disclosures -- and I get that there

19    are challenges and there could be, if we had a hearing, there

20    might be cross-examination on challenges -- but at the trade

21    secret disclosure point, this is not trial, this is not summary

22    judgment, I'm just gauging the sufficiency of the disclosures.

23    I'm going to consider what he said and I find it to be helpful,

24    as well as the Pellet declaration.

25         So as to the objection to Dr. Kaehler's declaration,

1    that is declined.

2        The second foundational issue is the timing, whether

3    now is the time, or not, to require them, and that goes into

4    the reasonableness of the disclosures in the sense that if we

5    were on day one of litigation, it might make sense to not have

6    as fulsome disclosures as if we were a day before trial, that

7    would be -- we need to have exactly the particular things being

8    tried and we wouldn't have time for later discovery, because

9    we'd be ready to try the case, or somewhere in between.

10        And my answer to that is, now is the time to have

11   proper disclosures, because we do have a case schedule set,

12   it's pretty aggressive, it's going to require discovery and

13   potential motion practice on these disclosures, and so the

14   answer is, now is the time to get proper disclosures.

15        There's an argument made in the papers about whether

16   it's premature to have these fulsome disclosures because

17   there's not been discovery from the defense, and that there

18   should be proportionality between the parties.

19        I don't think that's right.  I get the argument

20   about proportionality and sort of fairness, but the party

21   making a trade secret assertion has to know what its trade

22   secrets are and has to be able to explain them, ultimately, to

23   me and to a jury, but has to be able to define them with

24   reasonable particularity, and has to be able to do that even

25   before getting a chance to learn from the other party what it

1    knows.

2            Now, it's fair that there's a conferring process

3    here between the parties, and there has been some conferring

4    here, and the defense has come back and you've made amended

5    disclosures.  So we're going through the process here, but as

6    to whether I'm going to deny the motion to strike because there

7    hasn't been an opportunity to discover things from the defense,

8    I disagree.

9            I think that the party asserting the trade secrets

10   needs to define them with reasonable particularity.  That's

11   what the case law requires.  That's what the California statute

12   requires.  So the answer to that question is, now is the time.

13           Ms. Goodnough referenced the federal DTSA as being

14   one argument for why I shouldn't -- a Magic Leap argument for

15   why I shouldn't require complete disclosures is that it may not

16   be so important because there's some other claims in the case,

17   and there are other claims in the case, this is for sure not

18   the only claim in the case, but just because there's other

19   claims in the case, I'm not going to cut any corners on having

20   appropriate disclosures on this claim in the case.  It's an

21   important claim in the case, and it could be significant to the

22   cost of the case, and the parties are taking third party

23   discovery and doing things about trade secrets.

24           So the answer is, even though there are other claims

25   in the case, you know, there is a DTSA claim, I'm still going

1    to require proper disclosures.

2            So those are the foundational issues.  Minor

3    analysis is, looking at the Exhibit 3, the amended disclosures,

4    I agree with defendants that the current version does not have

5    reasonable particularity.  So I'm granting the motion to

6    strike, with leave to amend the disclosures to allow a chance

7    to define them with more particularity.

8            Here's the concerns which I see, again, not going

9    into the details of them, but echoing comments of Ms. Goodnough

10   here and in the papers.

11           Just at the high level, these seem to be much more

12   conceptual than particularized, and I am not saying that there

13   can't be charts.  I agree that charts and figures are helpful

14   at describing the big picture before I get into the

15   particularized analysis, but I think that what we have here

16   overall is more conceptual than the detail needed for the

17   defendants to respond to them, to challenge whether they are

18   trade secrets, to take discovery.

19           With the introductory, there's both an introduction

20   and an overview which, again, starts at the higher level, but

21   I agree there's lots of hedging going on about, subject to this

22   and contingent upon this, and other courts have struck down

23   that type of hedging and surplusage.  Whether you call it

24   either of those, it tends to put a little bit of fuzziness on

25   what follows, and to have -- has the effect of, even if there's

1   something particular later, the fuzziness of the introduction

2   could make that particularized portion be read to include

3   things relating to it, surrounding it, similar to it.

4          And so it's that language of introductory fuzziness

5   and overall architecture that could be read to make the more

6   specific parts more general in application.

7          So I agree with the defendants that the hedging at

8   the beginning causes a problem for the later, more specific

9   parts, which is, it makes it more generalized.  So that's a bit

10  of a drafting issue, which can be addressed without much

11  technical change, just as a drafting issue.

12          But then going more into the merits -- and again,

13  I'm steering clear of any particular words in the report --

14  I agree with Dr. Kaehler that many of the things described are

15  described as technologies and architecture, and if that -- if a

16  category of technology or a category of architecture could be

17  counted as a trade secret, I just think it's too broad.  It's

18  not particularized.  And I don't know how they can respond in

19  discovery without having a mountain of discovery on these

20  entire technologies and architectures, and that's my concern,

21  is how expensive it's going to be to fight this out.

22          And it may be that part of the approach is to -- you

23  had eight -- maybe it's to address these cost concerns and just

24  breadth concerns is, knock it down to a fewer than eight, and

25  focus on those that are most significant to Magic Leap.

1          So that's a kind of a prioritization issue, not a

2     particularity issue, but by prioritizing and, you know, maybe

3     it's meaning you've got some trade secrets that you're not

4     going to -- that you're going to put off to the side, not

5     because you have to, not because I'm making you, but in order

6     to focus on the most particularizable of them, that being an

7     approach that could get you over the hurdle.

8          I think these are all addressable concerns, so I'm

9     not dismissing the trade secret allegations from the case.

10    I think there are portions which are particular, but with the

11    introduction and with the way it's framed with the overview

12    coming first and it all potentially being argued that this

13    whole -- all of it is a trade secret, that, as currently

14    drafted, it does not meet the reasonable particularity

15    standard.

16         Now, as to how much time is needed to make

17    amended -- and I -- you know, I know there had been some

18    frustration back and forth between the parties, but ultimately

19    you're going to have to work together to filter and to --

20    because what will happen if there's fulsome discovery on the

21    current version is that there's going to be very broad

22    discovery potentially from the defendants, and then Magic Leap

23    will object to that as being not necessary, and third parties

24    will come in and object and they'll say this is not necessary

25    because these aren't trade secrets, and that's why we need to

1    do this first before costs of the litigation go out of control,

2    because we're starting with an overly broad starting point.  So

3    that's why this matters, I think, to the litigation.

4            So the question is, how much time does Magic Leap

5    seek to make disclosures, and what does defense think about it?

6            **MS. KOBIALKA:**  So, your Honor, I will want maybe a

7    little clarification so I understand the contours of your

8    ruling, but I think two weeks, we should be able to provide an

9    amended disclosure within two weeks.

10           **THE COURT:**  All right, Ms. Goodnough, any objection

11   to that?

12           **MS. GOODNOUGH:**  I think that's too long, your Honor.

13   I think that the 10 days in *VIA Technologies* that Judge Grewal

14   granted is more reasonable, especially given that they've

15   noticed depositions and we're trying to meet and confer on

16   dates.

17           **THE COURT:**  When is the -- so none are set yet.

18           **MS. GOODNOUGH:**  No.

19           **MS. KOBIALKA:**  Nothing is set, your Honor.

20           **MR. RUSSO:**  Your Honor, Jack Russo.  May I just be

21   heard for a minute?

22           **THE COURT:**  Yes, Mr. Russo.

23           **MR. RUSSO:**  Just quickly, your Honor, in terms of

24   where we are, not having a real -- what we view as a real trade

25   secret list in this case is stymieing a number of other trains

1    that are on the track, and the sooner that you would allow this

2    to happen with a prioritization principle, a selectivity

3    principle in mind, the better off I think everyone will be

4    here.  Thank you.

5         **THE COURT:**  All right, thank you.

6         I'm going to set the date for amended disclosures of

7    June 19th.  That's a little bit less than two weeks, but

8    I agree that we've got other things which are in motion, I've

9    got another hearing set, and I am inclined, not here in public,

10   but to give some more particularized examples to guide you in

11   the contours in a written order, but it's not going -- I'm not

12   going to go through every line of this to say, here's the

13   problem with this line.  It's going to be a little bit more --

14   I've said enough here that you can get to work on some aspects

15   of it without needing to wait for that.

16        **MS. KOBIALKA:**  When do you think you will provide

17   that order?  Because that will help --

18        **THE COURT:**  Great question.  If you can go talk to

19   the jurors down the hallway (laughter), and the nine parties in

20   the courtroom and their 10 attorneys, they can give you some

21   feedback.  I don't know.  It will depend on other events.  So

22   as soon as I can.

23        **MS. KOBIALKA:**  Okay.  Can I then ask -- because you

24   had mentioned that things are described as technology or

25   architecture, could you maybe just give me some numbers, so

1    I can see where you're going?

2            **THE COURT:**  Yeah, I'll put that in an order.

3            **MS. KOBIALKA:**  Okay.

4            **THE COURT:**  But you can search for those words.

5    There's a few of them in there.

6            All right, that's my ruling.  Thank you very much.

7    Have a good weekend.

8            **MS. GOODNOUGH:**  Thank you, your Honor.

9            **MS. KOBIALKA:**  Thank you.

10           **MR. KASTENS:**  Thank you.

11           **MR. RUSSO:**  Thank you, your Honor.

12           **THE COURT:**  Have a good day.

13           **MR. RUSSO:**  Thank you.

14                                                    <u>11:57 a.m.</u>

15                        ---o0o---

16

17

18

19

20

21

22

23

24

25

1

2

### CERTIFICATE OF TRANSCRIBER

4

5        I, Leo Mankiewicz, certify that the foregoing is a

6   true and correct transcript, to the best of my ability, of the

7   above pages of the official electronic sound recording provided

8   to me by the U.S. District Court, Northern District of

9   California, of the proceedings taken on the date and time

10  previously stated in the above matter.

11       I further certify that I am neither counsel for,

12  related to, nor employed by any of the parties to the action in

13  which this hearing was taken; and, further, that I am not

14  financially nor otherwise interested in the outcome of the

15  action.

16

17                                                    06/12/2017

18           Signature of Transcriber          Date

19

20

21

22

23

24

25